**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| NATIONAL TRUST FOR HISTORIC | ) |
| PRESERVATION IN THE UNITED STATES | ) |
| 2600 Virginia Ave. NW | ) |
| Suite 1100 | ) |
| Washington, DC 20037 | ) |
| | ) |
| and | ) |
| | ) |
| ASSOCIATION FOR THE PRESERVATION | ) |
| OF VIRGINIA ANTIQUITIES | ) |
| 204 West Franklin Street | ) |
| Richmond, Virginia 23220-5012, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|         v. | )     Civ. No. |
| | ) |
| TODD T. SEMONITE, Lieutenant General | ) |
| Chief of Engineers and Commanding General, | ) |
| U.S. Army Corps of Engineers | ) |
| 441 G Street, NW | ) |
| Washington, DC 20314, | ) |
| | ) |
| and | ) |
| | ) |
| ROBERT M. SPEER | ) |
| Acting Secretary of the Army | ) |
| 101 Army Pentagon | ) |
| Washington, DC 20310, | ) |
| | ) |
|     Defendants. | ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      This is an action to prevent Defendants (hereinafter, the "Corps") from irreparably

and unnecessarily damaging the James River and its historic surrounds at Jamestown, Virginia,

in violation of the National Environmental Policy Act ("NEPA"), the National Historic

Preservation Act ("NHPA"), the Clean Water Act ("CWA"), the Rivers and Harbors Act

("RHA"), and the regulations implementing those statutes.

2.      The James River flows through a collection of some of our Nation's most

significant historic and cultural resources.  Historic Jamestowne is the site of the first permanent

English colony in America.  Today it is a part of the Colonial National Historical Park, which

includes all of Jamestown Island.  Carter's Grove Plantation, located on the north bank of the

James River, has been officially recognized for its exceptional historic significance by the

National Park Service, which designated the site as a National Historic Landmark in 1971.  The

Colonial Parkway, built by the National Park Service as part of Colonial National Historical

Park, and designated as an All-American Road under the National Scenic Byways Program, runs

along the north bank of the James River near Jamestown.  The Parkway also connects Jamestown

to Colonial Williamsburg, a National Historic Landmark District and living history museum

located a few miles inland, and to Yorktown, where General Cornwallis' surrender effectively

concluded the Revolutionary War and established the United States as an independent Nation.

Indeed, the James River itself has been recognized by Congress as a unique and valuable historic

landscape through the establishment of the Captain John Smith Chesapeake National Historic

Trail ("Captain John Smith Trail"), the Nation's first water trail designated under the National

Trails System Act.

3.      For more than a century, the United States, the Commonwealth of Virginia, and

numerous local governments have worked to preserve and maintain this stretch of the James

River so that future generations could understand and appreciate its historic importance and

scenic beauty.  Until now, that effort has been successful:  the river and its landscape have

retained their historic and scenic attributes, and millions of visitors each year are able to experience this remarkably intact historic setting.

4.     On July 3, 2017, however, the Corps authorized Virginia Electric & Power Company (commonly referred to and hereafter referenced as "Dominion") to build massive new overhead electric transmission infrastructure known as the "Surry-Skiffes Creek-Whealton Project" straight through the heart of this historic landscape.  Among other things, the Project calls for the construction of seventeen steel towers fitted with flashing lights and transmission lines, up to 295 feet tall, crossing the James River directly across the Captain John Smith Trail, and within the historic viewshed of the Colonial Parkway, Jamestown Island, Colonial National Historical Park, and Carter's Grove National Historic Landmark.  The transmission towers would be located within one of the most historically significant and best-preserved areas of the historic James River landscape — a stretch of approximately 51 miles currently without overhead crossings of any kind, a portion of which has been designated by Virginia's state legislature as a historic river under the Virginia Scenic Rivers Program and is listed on the Nationwide Rivers Inventory under the federal Wild and Scenic Rivers Act.

5.     In authorizing the Project, the Corps violated NEPA by (i) failing to prepare a required Environmental Impact Statement ("EIS") before authorizing activities that will have significant environmental consequences; (ii) failing properly to consider feasible alternatives to the Project, including alternatives that would avoid and minimize the Project's impacts on historic resources; and (iii) failing to provide the public with an opportunity to review and comment on the agency's NEPA analysis before authorizing the Project.

6.     The Corps also violated the NHPA by (i) failing to undertake to the maximum extent possible such planning and actions necessary to minimize harm to Carter's Grove

National Historic Landmark; (ii) failing to consider all prudent and feasible alternatives to avoid adverse effects on Carter's Grove; and (iii) failing to undertake required analyses before eliminating alternatives from consideration.

7.     Moreover, the Corps also violated the CWA, the RHA, and its own regulations implementing those two statutes by (i) approving the Project despite the availability of less-damaging practicable alternatives; and (ii) arbitrarily and capriciously determining that the Project is in the public interest.

8.     Accordingly, Plaintiffs request that this Court vacate the Corps' approval of the Project; remand the matter to the Corps for further consideration; and grant declaratory and injunctive relief sufficient to ensure that the Corps complies with NEPA, the NHPA, the CWA, the RHA, and applicable regulations.

## JURISDICTION AND VENUE

11.     This action arises under NEPA, the NHPA, the CWA, the RHA, and their implementing regulations.

12.     Plaintiffs seek judicial review pursuant to Chapter 7 of the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701-706.

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a Defendant), and the APA.

14.     This Court may grant declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## PARTIES

16.     Plaintiff the National Trust for Historic Preservation in the United States ("National Trust") is a private charitable, educational, non-profit corporation chartered by Congress in 1949 to protect and defend America's historic resources, to further the historic preservation policy of the United States, and to facilitate public participation in the preservation of our nation's heritage.  *See* 54 U.S.C. § 312102.  In addition, the National Trust has been designated by Congress as a member of the Advisory Council on Historic Preservation ("ACHP"), which is responsible for working with federal agencies to implement and ensure federal agency compliance with Section 106 of the NHPA.  *Id.* §§ 304101(a)(8), 304108(a). The National Trust is headquartered in Washington, D.C., and has more than one million members and supporters around the country.

17.     The statutory powers of the National Trust include the power to bring suit in its corporate name.  *Id.* § 312105(c).  Consistent with its Congressional charter and its statutory powers, the National Trust has participated in numerous actions to enforce federal laws that protect historic and cultural resources, including NEPA and the NHPA.  Many of those cases have specifically addressed the Corps' responsibilities under those laws.  *See, e.g., Preservation Soc'y of Charleston v. U.S. Army Corps of Eng'rs*, 2013 U.S. Dist. LEXIS 175643 (D.S.C. Sept. 18, 2013) (Corps failed to conduct required analysis of impacts to historic sites); *National Trust for Historic Preservation v. U.S. Army Corps of Eng'rs*, No. 1:04-cv-287-LMB (N.D. Va., settled Oct. 1, 2004) (Corps failed to consider adverse visual effect of tract housing development on historic Oatland plantation); *Committee to Save Cleveland's Huletts v. U.S. Army Corps of Eng'rs*, 163 F. Supp. 2d 776 (N.D. Ohio 2001) (Corps violated the NHPA by failing to properly consult with state and federal agencies); *National Trust for Historic Preservation v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 784 (S.D.

Ohio 1982) (Corps violated NHPA by permitting construction of barge loading facility adjacent to historic Ohio River ferry).

18.     The National Trust has worked to protect and preserve the historic resources and landscape of the James River near Jamestown for many years.  In 2013 and 2016, the National Trust included the James River in its list of *America's 11 Most Endangered Historic Places*, and it has designated the James River as a National Treasure.  The National Trust also participated as a consulting party in the Project's Section 106 consultation process under the NHPA; retained Tabors Caramanis Rudkevich, an independent engineering firm (hereafter "Independent Engineers"), to determine whether cost-effective, technically viable, and less-harmful alternatives to the Project exist; and presented the Independent Engineers' findings to the Corps.  National Trust staff, members, and supporters regularly visit and enjoy the historic and scenic characteristics of the James River, Colonial National Historical Park, the Colonial Parkway, the Captain John Smith Trail, and other historic sites and districts that will be adversely affected by the Project.  The National Trust now brings this action on behalf of itself and its adversely affected members.

19.     The Association for the Preservation of Virginia Antiquities ("Preservation Virginia"), headquartered in Richmond, Virginia, is a private non-profit organization and statewide historic preservation leader founded in 1889.  Preservation Virginia is dedicated to perpetuating and revitalizing Virginia's cultural, architectural and historic heritage, thereby ensuring that historic places are integral parts of the lives of present and future generations.  Preservation Virginia's mission is directly consistent with and supportive of Article XI of the Constitution of Virginia, benefiting both the Commonwealth and the nation.  Preservation Virginia provides leadership, experience, influence, and services to the public and special

audiences by saving, managing, and protecting historic places, and by developing preservation policy, programs, and strategies with individuals, organizations, and local, state, and national partners.

20.    Preservation Virginia has worked to protect and preserve historic resources and the landscapes of the James River for many years.  It acquired 22.5 acres of Historic Jamestowne in 1893, which later became a part of Colonial National Historical Park. Preservation Virginia co-manages the site through a partnership with the National Park Service in an effort to preserve, protect and promote its historic significance.  Preservation Virginia included the James River in 2014 on the list of Virginia's Most Endangered Historic Places.  It also participated as a consulting party in the Project's Section 106 consultation process under the NHPA.  Preservation Virginia staff, members, and supporters regularly visit and enjoy the scenic and historic character of the James River, Colonial National Historical Park, the Colonial Parkway, the Captain John Smith Trail, and other historic sites and districts that will be adversely affected by the Project.  Preservation Virginia now brings this action on behalf of itself and its adversely affected members.

21.    Defendant Todd T. Semonite is sued in his official capacity as Chief of Engineers and Commanding General of the Corps.  In that capacity, he is directly responsible for the supervision, management, and control of the Corps, including oversight of the Corps' decision challenged here. His official residence is in Washington, D.C.

22.    Defendant Robert M. Speer is sued in his official capacity as the Acting Secretary of the Army.  In that capacity, he is ultimately responsible for overseeing the work of the Corps, an agency within the Department of the Army.  His official residence is in Washington, D.C.

## STATUTORY AND REGULATORY FRAMEWORK

### National Environmental Policy Act

23.     NEPA is our nation's "basic national charter for protection of the environment."
40 C.F.R. § 1500.1(a).  Its purposes are to "help public officials make decisions that are based
on understanding of environmental consequences, and to take actions that protect, restore, and
enhance the environment," and to "insure that environmental information is available to public
officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b),
(c).

24.     To implement these objectives, NEPA imposes "action-forcing" requirements on
all federal agencies.  Chief among these action-forcing requirements is the mandate that federal
agencies prepare a comprehensive EIS on any major action significantly affecting the human
environment.  42 U.S.C. § 4332(2)(C).  Required elements of an EIS include a description of
the proposed Federal action, a detailed discussion of the proposed action's environmental
consequences, and an analysis of alternatives to the proposed action (and the environmental
consequences of such alternatives).  *Id.*; 40 C.F.R. §§ 1502.13, 1502.14, 1502.16.  An EIS may
only be prepared by a federal agency or by an independent consulting firm hired (after
compliance with conflict-of-interest procedures) by a federal agency.  40 C.F.R. § 1506.5.  All
EISs (and their related technical appendices) must be made available in draft form for public
review and comment.  *Id.* §§ 1502.9, 1503.1.  The federal agency must also circulate final EISs
prior to making any decision on the proposed federal action at issue.  *Id.* §§ 1502.19, 1506.10.
The federal agency must respond in detail to all comments received on an EIS.  *Id.* § 1503.4.

25.     If an agency is uncertain as to whether NEPA requires preparation of an EIS, it
may prepare a concise public document known as an Environmental Assessment or "EA."  An
EA includes "brief discussions" of the proposed action, as well as alternatives to the action. 40

C.F.R. § 1508.9.  If the EA reveals no potential for significant environmental impacts, the

agency may approve the proposed action after preparing a Finding of No Significant Impact

("FONSI").  *Id*. § 1508.13; *see also* 33 C.F.R. § 230.11.  If the EA reveals that the proposed

action may significantly impact the environment, an EIS must be prepared.  40 C.F.R. § 1501.4.

In determining whether the proposed action will significantly impact the environment, federal

agencies must evaluate both the context and the intensity of potential environmental

consequences.  *Id*. § 1508.27.  The evaluation of intensity must address a variety of factors,

including, without limitation, the following:  unique characteristics of the geographic area, such

as proximity to historic or cultural resources, park lands, and wild and scenic rivers; the degree

to which environmental impacts are likely to be highly controversial; the degree to which the

action could establish a precedent for future actions with significant effects; the degree to which

the action may adversely affect historic districts, sites, highways, or structures that are listed or

eligible for listing in the National Register of Historic Places; the degree to which the impacts

of the action, when considered with other reasonably foreseeable federal, state, and local

actions, may be cumulatively considerable; and whether the action threatens a violation of other

Federal, State, or local environmental laws or requirements.  *Id*.  The presence of these factors

requires preparation of an EIS, even if the federal agency believes that on balance the proposed

action will be beneficial.  *Id*.

      26.    Under NEPA, both EAs and EISs must identify and evaluate reasonable

alternatives to proposed federal actions.  42 U.S.C. §§ 4332(2)(C), 4332(2)(E); 40 C.F.R. §§

1502.14, 1508.9.  Reasonable alternatives "include those that are ***practical*** or ***feasible*** from the

technical and economic standpoint, rather than simply ***desirable*** from the standpoint of the

applicant" for federal approval.  46 Fed. Reg. 18026, 18027 (Mar. 17, 1981) (emphasis

original).

27.     Public disclosure and input are central to NEPA, whether an agency prepares an

EIS or an EA.  Indeed, the United States Supreme Court has recognized that one of NEPA's

fundamental purposes is to guarantee that environmental information "will be made available to

the larger audience that may also play a role in both the decisionmaking process and the

implementation of that decision."  *Robertson v. Methow Valley Citizens' Council*, 490 U.S. 332,

349 (1989).  To that end, NEPA's implementing regulations generally require agencies to

"encourage and facilitate public involvement in decisions which affect the quality of the human

environment."  40 C.F.R. § 1500.2(d).  More specifically, an EA or FONSI must be circulated

for public review and comment whenever (i) there is a reasonable argument for preparation of

an EIS; (ii) the proposed action is new, unusual, or precedent-setting; (iii) there is either

scientific or public controversy over the proposed action; or (iv) the proposed action is located

in a floodplain or wetland.  *See* 46 Fed. Reg. 18026, 18037 (Mar. 23, 1981).

## National Historic Preservation Act

28.     In enacting the NHPA, Congress specifically declared a policy that "the

historical and cultural foundations of the Nation should be preserved as a living part of our

community life and development in order to give a sense of orientation to the American

people," and, further, that "the preservation of [our] irreplaceable heritage is in the public

interest."  The purposes of the NHPA include preserving "the historical and cultural

foundations" of the United States in order to "insure future generations a genuine opportunity

to appreciate and enjoy the rich heritage of our Nation" in the face of proposals to extend

"urban centers, highways, and residential, commercial, and industrial developments." Pub. L. No. 89-665, 80 Stat. 915 (Oct. 15, 1966).

29.     The NHPA directs the Secretary of the Interior to establish and maintain a National Register of Historic Places ("National Register") composed of historically significant "districts, sites, buildings, structures, and objects." 54 U.S.C. § 302101.  A nomination to list a historic resource in the National Register is reviewed by the relevant State Historic Preservation Officer or Tribal Historic Preservation Officer, and then forwarded for final approval to the Keeper of the National Register at the National Park Service. To be listed, a historic resource must be historically significant at the local, state or national level, be over fifty years old, and maintain its integrity. *See* 36 C.F.R. part 60.  A resource maintains its integrity when it is able to convey its historic significance to the public. Today, more than 90,000 historic places are listed in the National Register.

30.     The NHPA also creates a special category of nationally significant historic resources known as National Historic Landmarks ("NHLs").  An NHL must have national historic significance; must "possess exceptional value or quality in illustrating or interpreting the heritage of the United States"; must retain a high degree of historic integrity; must be recommended by the National Park System Advisory Board; and may only be designated by the Secretary of the Interior. 36 C.F.R. § 65.4.  Today, this designation is limited to approximately 2,500 sites.

31.     Section 106 of the NHPA generally requires federal agencies to "take into account" the impact of their undertakings on any site listed on or eligible for listing in the National Register of Historic Places.  54 U.S.C. § 306108.  Congress gave the ACHP authority to promulgate regulations governing the implementation of Section 106.  *Id.* § 304108.

Among other things, those regulations provide that agencies must consult with other parties to determine whether a proposed undertaking will have an adverse effect on historic properties and, if so, to discuss ways to avoid, minimize, or mitigate such effects.  36 C.F.R. §§ 800.4-800.6.

32.    Section 110(f) of the NHPA provides additional protections for NHLs and gives federal agencies special responsibilities to avoid and minimize harm to them.  When considering an undertaking that will directly and adversely affect an NHL, "the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark." 54 U.S.C. § 306107.

33.    The legislative history of the NHPA explicitly states that Section 110(f) "does not supersede Section 106, but complements it by setting a higher standard for agency planning in relationship to landmarks …."  H.R. Rep. No. 1457, at 36-37 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6401.  Congress gave the Secretary of the Interior (rather than ACHP) authority to promulgate guidelines governing the implementation of Section 110.  The Secretary's guidelines (promulgated through the National Park Service) confirm that Section 110(f) imposes a higher standard than Section 106:  "Section 110(f) of the NHPA requires that federal agencies exercise a higher standard of care when considering undertakings that may directly and adversely affect NHLs."  63 Fed. Reg. 20496, 20503 (Apr. 24, 1998).  The guidelines further mandate that agencies must "consider all prudent and feasible alternatives to avoid an adverse effect on the NHL" and specify a three-part balancing test to be applied whenever such alternatives may appear to "require undue cost" or "compromise the undertaking's goals and objectives."  *Id.*

**The Clean Water Act and the Rivers and Harbors Act**

34.     The CWA and the RHA govern the Corps' permitting responsibilities with respect to proposed federal actions requiring construction and/or discharge of pollutants in rivers, harbors, wetlands, and other waters of the United States.  *See* 33 U.S.C. §§ 403, 1344.

35.      The Corps is prohibited from issuing a permit if there is a practicable alternative that will cause less adverse impact to the environment.  40 C.F.R. §§ 230.10(a), 230.12(a)(3)(i).  Practicable alternatives are those alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  *Id*. § 230.10(a)(2).

36.     The Corps is also prohibited from issuing a permit if the proposed action is not in the public interest.  The Corps' public interest review must consider conservation, economics, aesthetics, environmental concerns, wetlands, and impacts to historic properties, among other things.  33 C.F.R. § 320.4.

**The Administrative Procedure Act**

37.     The APA provides that a reviewing court "shall" set aside agency actions, findings, or conclusions that are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

**FACTUAL BACKGROUND**

**The Proposed Project**

38.     The Project consists of three components: (1) a 500kV overhead transmission line across the James River from Surry to Skiffes Creek; (2) a 500kV-230kV-115kV

Switching Station at Skiffes Creek; and (3) a 230kV overhead transmission line from Skiffes Creek to Whealton.

39.     The Surry-Skiffes Creek component of the Project involves approximately 7.92 miles of new 500kV overhead electric transmission lines.  Approximately 4.11 miles of this segment will cross the James River directly through the Jamestown-Hog Island-Captain John Smith Trail Historic District, across the Captain John Smith Trail, and in close proximity to Historic Jamestowne, the Colonial Parkway, Colonial National Historical Park, and Carter's Grove National Historic Landmark.  The James River crossing includes 17 massive steel towers up to 295 feet tall, which will be fitted with flashing lights and transmission lines.

40.     The proposed Switching Station will involve the construction of a new complex in James City County to house electric transmission infrastructure. This component of the Project will also involve the installation of one 500kV terminal, five 230kV terminals, and three 155kV terminals, as well as transformers and additional transmission equipment and access routes. The Switching Station complex will occupy a 67-acre site and require clearing approximately 20 acres of forest.

41.     The Skiffes Creek-Whealton Line involves construction of a new 230kV overhead transmission line that extends approximately 20.2 miles within an existing utility right of way.  This segment also requires a 629-foot aerial crossing of Skiffes Creek.

**National Historical Significance of The James River and Surrounding Area**

42.     Dominion has proposed to build the Project in one of the most historically significant and sensitive areas in the nation.  It contains the earliest seeds of the United States. It is the place where people from North America, Europe and Africa first interacted.  And,

most of all, it is the place where Americans come to learn and experience their founding history firsthand.

43.    Historic Jamestowne, on Jamestown Island, is the site of the first permanent English settlement in America.  It was founded in 1607, predating Plymouth by 13 years and Massachusetts Bay by more than 20.  Jamestowne was the original capital of the Virginia Colony, the founding site of a global empire that would eventually carry English language, laws, and institutions across the North American continent.  Today, Historic Jamestowne is one of the world's most important archaeological sites. In 2010, 2013 and 2015, the Archaeological Institute of America listed finds from Historic Jamestowne among its annual Top Ten Discoveries. Exploration of the site remains ongoing, and, with it, our understanding of life in seventeenth-century America continues to evolve.  The Project would be visible from Jamestown Island, marring the site's historic setting.

44.    Historic Jamestowne is a part of Colonial National Historical Park, which is co-managed by the National Park Service and Preservation Virginia. The Park's walking trails lead visitors to Blackpoint, from which views extend across an expanse of the James River that is largely devoid of visible modern development.  This historic landscape would be familiar to the lookouts who served watch under orders from Captain John Smith in the early 1600s.

45.    Colonial National Historical Park ties together the earliest history of the founding of the United States.  In addition to Historic Jamestowne, the Park includes Yorktown Battlefield, the site of the final major battle of the American Revolutionary War. Visitors to the park experience the beginning and the end of English colonial America. Jamestown and Yorktown are connected by the Colonial Parkway, a 23-mile scenic roadway

that also takes visitors to Williamsburg, Virginia.  The Colonial Parkway begins at the Visitor

Center on Jamestown Island and follows the north shore of the James River before heading

north to Williamsburg, where it travels underneath the restored colonial town before turning

eastward to its terminus at the Yorktown Visitor Center.  The Parkway was carefully designed

and constructed by the National Park Service to allow visitors to travel between these sites via

a roadway that conserves the area's scenery and natural and historic resources.  It is a three-

lane road, with a 45 mile-per-hour speed limit, intended to promote scenic enjoyment. The

Parkway was designed and built over a 26-year period stretching through the Great Depression

and World War II. Since its completion, visitors have enjoyed expansive views of the James

River along the Parkway's designed lookout points. Visitors emerge from forested areas to

view wide open expanses of the James River, emulating the experience of the first settlers and

native Powhatan Indians.  The most dramatic views occur as visitors leave Jamestown heading

toward Williamsburg — precisely the lookout area through which the Project will pass.  The

Colonial Parkway is part of a historic district that is listed on the National Register in its own

right.

46.    Carter's Grove National Historic Landmark is a large plantation located along

the north shore of the James River.  It was built by Carter Burwell, grandson of Robert "King"

Carter, between 1749 and 1756, and is one of the best-preserved and most important examples

of eighteenth-century Georgian architecture in North America. The structure and its

surrounding landscape were designed to face the river, which served as the primary

transportation route at the time of construction.  In fact, the front door of Carter's Grove looks

directly out to the James River.  In 1976, archaeologists working at Carter's Grove discovered

the remains of an even older community known as Martin's Hundred.  Settled in 1617,

approximately 140 colonists lived there in 1622 at the time of a strategic attack by Native Americans in which 78 colonists were killed.  Archaeological work at Martin's Hundred provided vital information that later helped identify the remains of the original 1607 James Fort just upriver at Historic Jamestowne, further confirming the national significance of the site.  The Project would introduce major new industrial infrastructure into the well-preserved historic setting of Carter's Grove.

47.  In 2007, Congress established the Captain John Smith Trail along the James River and declared the James to be "America's Founding River."  The Trail commemorates the exploratory voyages of Captain John Smith, celebrates the long history of indigenous stewardship of the Chesapeake region prior to European contact, and provides opportunities for all Americans to enjoy recreational activities surrounded by this history. Visitors access the Trail by land and by water.  From both perspectives, they can see, experience, and learn what the explorers and native inhabitants of the region experienced more than 400 years ago.  The National Park Service has identified landscapes along the Trail that express the aesthetic or historic sense of the seventeenth century. The vast majority of the shoreline near the Project has been so identified by the Park Service.

48.  The Captain John Smith Trail is also a contributing resource to a larger historic area known as the Jamestown-Hog Island-Captain John Smith Trail Historic District, which includes the James River and its shoreline within the Project area.  The Keeper of the National Register of Historic Places determined that this entire Historic District, including the segment of the Captain John Smith Trail within it, retained sufficient historic integrity and had sufficient historic significance to be eligible for listing in the National Register. The question of the District's eligibility for the National Register was raised to the Keeper for a decision

during the Section 106 process as a result of a disagreement between the Corps, on one hand,

and the National Trust and Preservation Virginia (along with other consulting parties), on the

other. On August 14, 2015, the Keeper concluded that the entire landscape is eligible for the

National Register.  In reaching that decision, the Keeper (i) rejected the Corps' contentions

(based on documentation from Dominion) that neither the District nor the segment of the

Captain John Smith Trail within the District should be recognized as historic sites; and (ii)

confirmed that the Project area's substantial concentration of significant historic and scenic

resources, including Jamestown, Carter's Grove, the Hog Island Wildlife Management Area,

and the Captain John Smith Trail, are interconnected and together create a landscape that is

deserving of recognition and listing as a whole in the National Register.

49.     Dominion has admitted that the historic properties described above are not just

significant in themselves, but are also connected in ways that create a broader cultural

landscape eligible for the National Register.

### The Project Approval Process

50.     On August 28, 2013, the Corps issued a notice formally initiating the Project

permitting process.  The notice stated that (i) Dominion had applied for authorization to

construct the Project pursuant to the CWA and the RHA; and (ii) a preliminary review had

indicated that no EIS would be required.  The notice did not provide any other information

about the preliminary review.  Nor did the Corps make the preliminary review available to the

public.

51.     In response to the August 28, 2013 public notice, a wide variety of stakeholders

expressed concern about the Project's impacts.  The National Park Service, among others,

informed the Corps that the Project would have significant impacts on historic resources,

aesthetics, recreation, health and safety, and socioeconomics, suggesting that the preparation of an EIS was required.

52.     Between  2014 and 2017, the Corps held consultation meetings about the Project pursuant to Section 106 of the NHPA.  Plaintiffs each participated in the consultation process, and during that process they repeatedly expressed significant concerns about the Project's impacts on historic resources, the Corps' failure to consider less-damaging alternatives, the Corps' failure to conduct necessary analyses and investigations, the Corps' refusal to provide or discuss its draft NEPA analysis, the Corps' failure to comply with Section 110(f) of the NHPA, and the Corps' failure to involve the public in the agency decision-making process.  Plaintiffs also noted that the Project poses a grave threat to the economy of the region, which is largely based on heritage tourism.

53.     Plaintiffs were not alone in these concerns.  Although the Corps refused to make any draft NEPA documents available for review, interested parties nonetheless submitted comments disputing the agency's analysis and approach.  Local, state, and federal elected officials requested that the Corps avoid impacts to historic resources, prepare an EIS, and provide the public with meaningful opportunities to be involved in the permit review process.  State and federal agencies with jurisdiction over affected resources — including, most notably, the National Park Service, the Council on Environmental Quality, the ACHP, the Virginia Department of Historic Resources, and the Keeper of the National Register of Historic Places — disputed various portions of the Corps' assessment of the Project's effects, its failure to prepare an EIS, and its refusal to meaningfully pursue alternatives.  Nearly 30,000 people signed a petition disputing the Corps' characterization of the size, nature, and effects of the Project and asking that an alternative be pursued.

54.     Faced with the Corps' refusal to meaningfully consider alternatives to the

Project, Plaintiffs commissioned the Independent Engineers to investigate whether other, less-

harmful options might be available.  The Independent Engineers found that there were at least

four technically and financially feasible alternatives capable of avoiding harm to historic

resources:

- Reconductoring and reconfiguring existing electric generation and transmission
  infrastructure to increase capacity.

- Operating the existing Yorktown 3 generation facility as needed during
  "summer peak conditions."

- Operating Yorktown 3 on stand-by as needed during "summer peak"
  conditions, upgrading Yorktown 3 to run as a synchronous condenser and
  reconfiguring operating conditions of existing Dominion transmission lines.

- Developing new 230kV transmission infrastructure primarily within existing
  Dominion rights-of-way or along exiting highway routes to increase resiliency
  and capacity.

The Independent Engineers found that each of these alternatives would feasibly address all

transmission needs more quickly and less expensively than the Project.  Notably, those

conclusions were based on data submitted *by Dominion* to the Federal Energy Regulatory

Commission.

55.     The Corps eventually held one public meeting addressing the Project.  The

meeting was convened in October 2015, well after much of the Corps' decision-making had

already been completed. The Corps specifically refused to make any NEPA analysis or

documentation available for public review before or during the meeting.  Indeed, at no point

did the Corps make available for public comment an EA, a FONSI, or any other NEPA

document addressing the Project.

56.     In May 2017, the Corps, Dominion and several other parties executed a

Memorandum of Agreement ("MOA") concluding the Section 106 consultation process.  The

MOA acknowledged that the Project will adversely affect numerous historic sites, including the

Captain John Smith Trail, Carter's Grove National Historic Landmark, Colonial National

Historical Park, the Colonial Parkway, Jamestown-Hog Island-Captain John Smith Trail

Historic District, Jamestown National Historic Site and Historic District, Archeological Site

44JC0662, the Battle of Yorktown, and Fort Crafford.  The MOA purported to "resolve" those

adverse effects largely through compensatory mitigation — for example, by requiring

Dominion to install interpretive signs, conduct a survey of the James River landscape, evaluate

multiple finishes for transmission towers, complete a study on heritage tourism and visitor

experience, and contribute to various compensatory mitigation funds.  However, an attachment

to the MOA concedes that compensatory mitigation may not directly address the historic

characteristics and attributes affected by the Project.

57.     In addition to signing the MOA, the ACHP also invoked a rarely used provision

of the Section 106 regulations, and submitted formal comments to the Corps regarding the

Project.  On May 2, 2017, pursuant to 36 C.F.R. § 800.7(b), ACHP's Chairman issued a

detailed six-page letter criticizing the Corps for (among other things) inadequate coordination

between federal and state reviews; an "extremely problematic" alternatives analysis;

"unfortunate" lack of coordination between the Corps' NEPA and Section 106 reviews; failure

to "provide the level of public or stakeholder input appropriate for a controversial

infrastructure project of this type that would affect this cluster of nationally significant historic

properties"; and a "disappointing" emphasis on mitigation, rather than consideration of alternatives that would avoid and minimize harm to historic resources. On information and belief, the Corps authorized the Project without ever issuing a formal response to ACHP's May 2, 2017 comments.

58.    On June 12, 2017, the Corps executed a document entitled "Memorandum for the Record" ("Memorandum"). The Memorandum purports to be an "Environmental Assessment and Statement of Findings" for the Project. The Memorandum concedes that the Project will be built across a stretch of the James River that is a "unique and highly scenic" area and a "national treasure"; that "the Corps has concluded that the proposed project will have adverse impact on scenic viewsheds"; that "the proposed project crosses the James River in an area that is currently designated by the Commonwealth of Virginia as scenic and listed on the Nationwide River Inventory for its outstanding [and] remarkable values pertaining to history"; that the project will result in "diminished integrity of setting and feeling" on and near the James River; that the Project will "introduce elements that decrease the integrity of [historic] properties' significant historic features and may change physical features within the properties' settings"; that the Project will "intrude upon the viewsheds of historic properties and on a unique and highly scenic section of the James River"; and that, when viewed from historic properties near the James River, including Carter's Grove National Historic Landmark, "the project will be a modern intrusion." Nevertheless, the Memorandum concluded that the Project's impacts would be less than significant, dismissed potential alternatives, and authorized Dominion to proceed.

59.    The Memorandum does not purport to be a FONSI within the meaning of NEPA. No FONSI for the Project was made available for review or comment prior to the

Corps' decision to authorize the Project, and, on information and belief, none has ever been prepared.

60.    The Memorandum does not contain any findings or analysis addressing Section 110(f) of the NHPA.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim 1 – Violation of the National Environmental Policy Act

61.    Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 60 above and 68 through 78 below.

62.    NEPA mandates the preparation of a detailed EIS prior to the approval of any major federal action that may significantly impact the human environment.  The human environment is defined comprehensively to include the natural environment, the built environment, and the relationship of people to the environment.  Among other things, the human environment includes historic and cultural sites, resources, properties, and landscapes. In evaluating the significance of an action's potential impacts on the human environment, federal agencies are required to take into account several considerations, including, without limitation, the degree to which effects on the human environment are likely to be controversial; the degree to which structures listed in or eligible for listing in the National Register may be adversely affected; unique characteristics of the geographic area such as proximity to historic or cultural resources; the degree to which possible effects may be uncertain or involve unique or unknown risks; the extent to which the action, when combined with other past, present, and reasonably foreseeable projects, may have cumulatively significant impacts; the extent to which the action may cause loss or destruction of significant scientific, cultural, or historic resources; and whether the action threatens a violation of

federal, state, or local law or requirements imposed for the protection of the environment.   40 C.F.R. § 1508.27.

63.     These considerations, both individually and collectively, required Defendants to prepare an EIS for the Project.  In deciding not to prepare an EIS before approving the Project, Defendants (i) failed to take into account all required considerations; (ii) failed properly to evaluate the few considerations that were taken into account; (iii) failed to address the concerns of the federal, state, and local agencies with jurisdiction and expertise over affected resources; (iv) failed properly to determine whether mitigation would reduce the Project's impacts to less-than-significant levels; (v) failed to issue a FONSI supporting the Corps' decision not to prepare an EIS; and (vi) failed to make an independent determination about the need for an EIS.  Each of these failures was arbitrary, capricious, an abuse of discretion, and a violation of law.

64.     NEPA mandates that federal agencies study, develop, and describe appropriate alternatives to recommended courses of action for any proposal which involves unresolved conflicts concerning alternative uses of available resources.  42 U.S.C. § 4332(2)(E).

65.     Defendants' approval of the Project involves an unresolved conflict concerning alternative uses of the historic and scenic resources at, along, over, and near the James River. Defendants nonetheless refused to describe, include, or consider in the EA a detailed evaluation of reasonable alternatives that would undisputedly avoid or minimize impacts on the human environment.  Reasonable alternatives excluded from proper consideration include, but are not limited to, the Independent Engineers' alternatives described above, which would satisfy the region's future need for reliable electrical supply without significantly impacting the sensitive historic and cultural resources at and near Jamestown.  In evaluating alternatives

to the Project, Defendants (i) failed properly to evaluate the reasonableness of alternatives that would avoid or minimize impacts on the human environment; (ii) inconsistently described and applied the stated purpose and need for the Project; (iii) failed properly to evaluate the advantages and disadvantages of the alternatives available, including failure to properly evaluate the economic impacts and cumulative impacts of each alternative; and (iv) failed to make independent determinations regarding the advantages, disadvantages, and reasonableness of alternatives.  Each of these failures was arbitrary, capricious, an abuse of discretion, and a violation of law.

66.     NEPA requires federal agencies to make relevant environmental information available to the public so that interested parties may play an active role in both the decision-making process and the implementation of the decision.  To the fullest extent possible, agencies must encourage and facilitate public involvement in all decisions which affect the quality of the human environment.

67.     Defendants (i) refused to circulate the EA for public review and comment despite repeated requests from Federal, State, and local officials, members of the public, plaintiffs, and other stakeholders; (ii) refused to make any FONSI available for public comment; and (iii) refused to provide interested parties with information necessary to allow independent experts to identify and evaluate potential alternatives to the Project.  Each of these refusals was arbitrary, capricious, an abuse of discretion, and a violation of law.

## Claim 2 -- Violation of the National Historic Preservation Act

68.     Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 67 above and 73 through 78 below.

69.     The NHPA mandates that, prior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark. 54 U.S.C. § 306107. To meet that responsibility, the federal agency must consider all prudent and feasible alternatives to avoid an adverse effect on the landmark.  If the avoidance alternatives appear to be infeasible, the agency must undertake a three-part analysis weighing harm, public interest, and mitigation.

70.     The Corps serves as the responsible federal agency for the Project.  Carter's Grove is a National Historic Landmark.  The Project will have an adverse effect on Carter's Grove.

71.     The adverse effect on Carter's Grove will be the direct result of implementing the Project.

72.     Defendants (i) failed to undertake to the maximum extent possible the planning and actions necessary to minimize harm to Carter's Grove; (ii) failed to consider all prudent and feasible alternatives to avoid an adverse effect on Carter's Grove; (iii) failed to undertake the three-part analysis required by Section 110(f) before eliminating alternatives from consideration; and (iv) failed to address concerns of the federal, state, and local agencies with jurisdiction and expertise relevant to Carter's Grove.  Each of these failures was arbitrary, capricious, an abuse of discretion, and a violation of law.

**Claim 3 -- Violation of the Clean Water Act and Rivers and Harbors Act**

73.     Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 72 above.

74.     The Clean Water Act and its implementing regulations prohibit the Corps from authorizing the discharge of any dredge or fill material into the waters of the United States if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.  40 C.F.R. § 230.10.

75.     The Independent Engineers' alternatives each meet the underlying purpose of the Project; each would have fewer impacts on wetlands, historic properties, and other environmental resources than would the Project; and each of the alternatives is "practicable" within the meaning of the CWA and its implementing regulations. In particular, the Independent Engineers' alternatives would avoid the impacts to wetlands and waters of the United States caused by the Surry-to-Skiffes Creek portion of the Project because *none of the alternatives would require a new overhead crossing of the James River.*

76.     Therefore, the Project is not the least environmentally damaging practicable alternative ("LEDPA") and the Corps' approval of the Project was arbitrary, capricious, and a violation of the CWA.

77.     The CWA, the RHA, and their implementing regulations also prohibit the Corps from issuing a permit for any activity that is not in the public interest.  33 C.F.R. § 320.4.  In evaluating the public interest, the Corps is required to consider economics, aesthetics, environmental concerns, historic properties, fish and wildlife values, and recreation, among other things.  *Id.*

78.     Defendants' evaluation of the public interest (i) failed to properly account for long-term and cumulative impacts; (ii) improperly assumed that the MOA will mitigate adverse impacts; (iii) failed to accurately to assess the existing visual and historic environment; and (iv) concluded, contrary to the evidence, that the detrimental impacts of the Project would be "minimal."  Each of these errors was arbitrary, capricious, an abuse of discretion, and a violation of law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(1)     Declare that the Corps' decision to authorize construction and operation of the Surry-Skiffes Creek-Whealton Project as described herein violates NEPA, the NHPA, the CWA, and the APA;

(2)     Set aside and remand the challenged Permit, Memorandum for the Record, EA, and associated findings as required by NEPA, the NHPA, the CWA, and the APA;

(3)     Enjoin Defendants and their officers, administrators, agents, employees , and those in active concert or participation with them from authorizing project construction or operation until they have fully complied with NEPA, the NHPA, the CWA, and the APA;

(4)     Award Plaintiffs their reasonable attorneys' fees and costs, pursuant to 28 U.S.C. § 2412 and 54 U.S.C. § 307105; and

(5)     Grant Plaintiffs such other and further temporary, preliminary, and permanent relief that the Court deems just and proper.

Respectfully submitted this 3rd day of August, 2017.


     */s/ Daniel Morris*

Emma Hand, D.C. Bar No. 476001
Daniel Morris, D.C. Bar No. 1018371
Dentons LLP
1900 K Street, NW
Washington, DC 20006
(202) 408-7094
emma.hand@dentons.com
daniel.morris@dentons.com


Matthew G. Adams (*pro hac vice* forthcoming)
Dentons LLP
One Market Plaza, Spear Tower
24th Floor
San Francisco, CA 94105
(415) 882-0351
matthew.adams@dentons.com

Elizabeth S. Merritt, D.C. Bar No. 337261
Deputy General Counsel
National Trust for Historic Preservation
2600 Virginia Ave. NW, Ste. 1100
Washington, DC 20037
(202) 588-6026
emerritt@savingplaces.org

Sharee Williamson, D.C. Bar No. 990497
Associate General Counsel
National Trust for Historic Preservation
2600 Virginia Ave. NW, Ste. 1100
Washington, DC 20037
(202) 588-6194
swilliamson@savingplaces.org