# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 17-cv-01574-RCL |
| TODD T. SEMONITE, Lieutenant General, U.S. Army Corps of Engineers, *et al*., | ) ) ) | |
| Defendants | ) ) | |
| and | ) ) | |
| VIRGINIA ELECTRIC & POWER COMPANY | ) ) | |
| Defendant-Intervenor. | ) ) | |

---

## OPPOSITION OF THE NATIONAL TRUST FOR HISTORIC PRESERVATION AND THE ASSOCIATION FOR THE PRESERVATION OF VIRGINIA ANTIQUITIES TO DEFENDANTS' MOTIONS FOR REMAND WITHOUT VACATUR

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

GLOSSARY ............................................................................................................................. 1

INTRODUCTION AND BRIEF SUMMARY OF BACKGROUND ...................................... 2

ARGUMENT ............................................................................................................................ 7

    I.       Judicial Estoppel Precludes Defendants From Contesting These Remedy
            Proceedings ................................................................................................................ 7

    II.     Vacatur Remains The Appropriate Remedy ......................................................... 10

          A.    *Allied-Signal* Factor One:  The Corps' Multiple Failures To Comply
                With NEPA And The NHPA Are "Serious Deficiencies." ....................... 12

                1.     The Corps' Failure To Prepare An EIS Before Approving
                         The Project Was A Serious Deficiency, And The Agency
                         Has Conceded As Much .............................................................. 12

                2.     The Corps' Erroneous Interpretation Of NHPA Section
                         110(f) Was A Serious Deficiency, And Neither Defendant
                         Has Presented Any Argument To The Contrary ........................... 16

          B.    *Allied-Signal* Factor Two:  The "Disruptive Consequences" Alleged
                By Defendants Are Speculative, Self-Inflicted, And Insufficient To
                Justify Remand Without Vacatur ............................................................ 18

                1.     Defendants' Hyperbolic And Inequitable Claims Of
                         Disruption To Electric Reliability Do Not Justify Remand
                         Without Vacatur ......................................................................... 18

                2.     Federal Defendants' Concerns About Administrative
                         Inconvenience Do Not Justify Remand Without Vacatur ........... 24

                3.     Dominion's Self-Inflicted Economic Injuries Do Not
                         Justify Remand Without Vacatur ................................................ 26

                4.     Dominion's Speculative Concerns About "Uncertainty" Do
                         Not Justify Remand Without Vacatur ......................................... 26

                5.     The Prospect Of Future Relief Does Not Justify Remand
                         Without Vacatur ......................................................................... 27

                6.     Defendants' Failure To Address Ongoing Environmental
                         Harm Weighs Against Remand Without Vacatur ........................ 28

          C.    Vacatur Will Protect The Purpose And Integrity Of The EIS
                  Process ...................................................................................................... 29

CONCLUSION ...................................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*\*Allied-Signal v. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................................ *passim*

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ................................................................................10

*Bldg. Ind. Def. Found. v. Norton*,
  231 F. Supp. 2d 100 (D.D.C. 2002) ................................................................19, 20, 21

*Citizens for Responsibility & Ethics in Washington v. Fed. Election
  Comm'n*,
  316 F. Supp. 3d 349 (D.D.C. 2018) ..........................................................................17

*Comcast v. Fed. Commc'n Comm'n*,
  579 F.3d 1 (D.C. Cir. 2009) ......................................................................................18

*Fertilizer Inst. v. U.S. EPA*,
  935 F.2d 1303 (D.C. Cir. 1991) ................................................................................22

*Found. on Econ. Trends v. Heckler*,
  756 F.2d 143 (D.C. Cir. 1985) ..................................................................................15

*Friends of the Capital Crescent Trail v. FTA*,
  218 F. Supp. 2d 53 (D.D.C. 2016) ............................................................................28

*Fund for Animals v. Norton*,
  294 F. Supp. 2d 92 (D.D.C. 2003) ............................................................................26

*Grand Canyon Trust v. FAA*,
  290 F.3d 339 (D.C. Cir. 2002) ............................................................................13, 14

*Greater Yellowstone Coal. v. Bosworth*,
  209 F. Supp. 2d 156 (D.D.C. 2002) ..........................................................................16

*Humane Soc v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017) ..................................................................................17

*Lemon v. Geren*,
  514 F.3d 1312 (D.C. Cir. 2008) ................................................................................15

*NACS v. Bd. of Governors of the Fed. Reserve Sys.*,
  958 F. Supp. 2d 85 (D.D.C. 2013) ............................................................................17

*Nat'l Parks Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ...................................................................................26

*Nat'l Parks Conservation Ass'n v. Jewell*,
    62 F. Supp. 3d 7 (D.D.C. 2014) ...............................................................................27

*Nat'l Ski Areas Ass'n v. U.S. Forest Serv.*,
    910 F. Supp. 2d 1269 (D. Colo. 2012) ......................................................................27

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ............................................................................................7, 8

*New York City v. Pine*,
    185 U.S. 93 (1902) ................................................................................................23

*New York Football Giants v. Los Angeles Chargers Football Club*,
    291 F.2d 471 (5th Cir. 1961) ..................................................................................23

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*,
    531 F.3d 1114 (9th Cir. 2008) ................................................................................12

*Otay Mesa L.P. v. U.S. Dep't of the Interior*,
    344 F. Supp. 3d 355 (D.D.C. 2018) .........................................................................27

*Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co.*,
    324 U.S. 806 (1945) ..............................................................................................23

*Public Employees for Environmental Responsibility v. U.S. Fish &
    Wildlife Serv.*,
    189 F. Supp. 3d 1 (D.D.C. 2016) ..........................................................15, 19, 25, 27

*Public Employees for Environmental Responsibility v. Hopper*,
    827 F.3d 1077 (D.C. Cir. 2016) ..............................................................................27

*Reed v. Salazar*,
    744 F. Supp. 2d 98, 120 (D.D.C. 2010) ...................................................................27

*Robertson v. Methow Valley Citizens Ass'n*,
    490 U.S. 332 (1989) ...................................................................................12, 15, 29

*Nat'l Parks Conservation Ass'n v. Semonite (Semonite I)*,
    282 F. Supp. 3d 284 (D.D.C. 2017) ...........................................................................3

*Nat'l Parks Conservation Ass'n v. Semonite (Semonite II)*,
    311 F. Supp. 3d. at 357 .......................................................................................3, 12

*Nat'l Parks Conservation Ass'n v. Semonite (Semonite III)*,
  916 F.3d 1075 (D.C. Cir. 2019) .......................................................................... *passim*

*Nat'l Parks Conservation Ass'n v. Semonite* (*Semonite IV*),
  925 F.3d 500, 502 (D.C. Cir. 2019) .................................................................... *passim*

*Sierra Club v. Van Antwerp*,
  719 F. Supp. 2d 77 (D.D.C. 2010) ................................................................10, 11, 28

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F. Supp. 3d 91 (D.D.C. 2017) ...................................................................... *passim*

*Stewart v. Azar*,
  313 F. Supp. 3d 237 (D.D.C. 2018) .........................................................................11, 17

*Temple Univ. Hosp. v. Nat'l Labor Relations Bd.*,
  929 F.3d 729 (D.C. Cir. 2019) ...............................................................................9, 10

*Walker v. Pharm. Research & Mfrs*.,
  461 F. Supp. 2d 52 (D.D.C. 2006) ...........................................................................18

**Statutes**

5 U.S.C § 706(2) ...........................................................................................................10

42 U.S.C. § 4331 ...........................................................................................................30

42 U.S.C. § 4332 ......................................................................................................12, 16

54 U.S.C. § 306107 .......................................................................................................17

**Rules and Regulations**

40 C.F.R. § 40 .............................................................................................................30
40 C.F.R. § 1500.1 ..................................................................................................12, 29
40 C.F.R. § 1500.2 .......................................................................................................24
40 C.F.R. § 1500.6 .......................................................................................................24
40 C.F.R. § 1501.2 .......................................................................................................24
40 C.F.R. § 1502.1 .......................................................................................................24
40 C.F.R. § 1502.5 .......................................................................................................29
40 C.F.R. § 1508.27 ................................................................................................13, 30

84 Fed. Reg. 1082 (Feb. 1, 2019) ...................................................................25
84 Fed. Reg. 2670 (Feb. 7, 2019) ...................................................................30
84 Fed. Reg. 2835 (Feb. 8, 2019) ...................................................................25
84 Fed. Reg. 9509 (Mar. 15, 2019)..................................................................25
84 Fed. Reg. 12237 (Apr. 1, 2019) ..................................................................25
84 Fed. Reg. 12596 (Apr. 2, 2019) ..................................................................25
84 Fed. Reg. 19060 (May 3, 2019) ..................................................................25
84 Fed. Reg. 29177 (June 21, 2019) ................................................................25

## Other Authorities

"2018 Budget Justification" *available at*
      https://cdm16021.contentdm.oclc.org/digital/collection/p16021coll6/id
      /1852 (last visited Aug. 14, 2019)..............................................................25

"2019 Budget Justification" *available at*
      https://cdm16021.contentdm.oclc.org/digital/collection/p16021coll6/id
      /2045 (last visited Aug. 14, 2019)..............................................................25

Virginia Electric and Power Company's Integrated Resource Plan, Case
      No. 2018-PUR-00065 (Dec. 7, 2018) *available at*
      http://www.scc.virginia.gov/docketsearch/DOCS/4d5g01!.PDF (last
      visited Aug. 15, 2019)................................................................................21

Charles City Combined-Cycle Power Project *available at*
      https://www.power-technology.com/projects/charles-city-combined-
      cycle-power-project-virginia/ (last visited Aug. 15, 2019).........................30

PJM Load Forecasting Model Whitepaper (April 27, 2016) *available at*
      https://www.pjm.com/~/media/library/reports-notices/load-
      forecast/2016-load-forecast-whitepaper.ashx ............................................21

## **GLOSSARY**

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **Corps** | United States Army Corps of Engineers |
| **DOE** | Department of Energy |
| **EIS** | Environmental Impact Statement |
| **Dominion** | Virginia Electric & Power Company |
| **MATS** | Mercury Air Toxics Standard |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National Historic Preservation Act |
| **NPCA** | National Parks Conservation Association |
| **PJM** | PJM Interconnection, LLC |
| **SCC** | Virginia State Corporation Commission |

## INTRODUCTION AND BRIEF SUMMARY OF PROCEDURAL BACKGROUND

The United States Army Corps of Engineers ("Corps") authorized Virginia Electric & Power Company ("Dominion") to build the Surry-Skiffes Creek-Whealton project ("Project"), a massive overhead electric transmission line with steel towers up to 295 feet tall, across the James River in the heart of one of the most sensitive historic landscapes in the United States—the place where people from North America, Europe, and Africa first interacted; the place where the earliest seeds of the United States were planted; and, most of all, a place where Americans come to learn and experience their founding history.

Pursuant to the Corps' authorization (the "Permit"), the Project physically occupies an Historic District, crosses through a Congressionally-designated National Historic Trail, and adversely affects eight sites listed in the National Register of Historic Places, including a National Historic Landmark.

Although the National Environmental Policy Act ("NEPA") requires agencies to undertake a comprehensive Environmental Impact Statement ("EIS") before approving major federal actions, the Corps elected to proceed with the Project on the basis of a brief Finding of No Significant Impact ("FONSI") instead.  And although Section 110(f) of the National Historic Preservation Act explicitly requires agencies to minimize harm to National Historic Landmarks, the Corps concluded the statute was inapplicable.

Accordingly, Plaintiffs the National Trust for Historic Preservation ("National Trust") and the Association for the Preservation of Virginia Antiquities ("Preservation Virginia") filed suit.

Plaintiffs, with the National Parks Conservation Association ("NPCA") (plaintiff in related case number 17-1361) moved to enjoin construction of the Project until the merits of the case could be resolved.  In response, Dominion argued that injunctive relief was unnecessary because the Project could be removed in case of an adverse decision on the merits.  The company assured this Court that removal of the Project was "not merely a theoretical possibility."  Dominion Opposition to Motion for Preliminary Injunction (ECF 29) at 39.  Rather, "both Dominion and the Corps recognize that removal of the towers would be feasible."  *Id*. at n.39.

This Court ultimately denied the preliminary injunction request on other grounds. *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284 (D.D.C. 2017) ("*Semonite I*").  But additional injunction proceedings followed:  NPCA filed additional motions, and each time Defendants argued that injunctive relief was inappropriate because the Project could be removed.  NPCA's additional requests to enjoin construction were denied, and Dominion proceeded with construction.

On the merits, this Court granted summary judgment to Defendants on all claims. *Nat'l Parks Conservation Ass'n v. Semonite*, 311 F. Supp. 3d 350 (D.D.C.2018) ("*Semonite II*").  Plaintiffs appealed.   The appeal was fully briefed, and oral argument held, by December 7, 2018.

In February, 2019, without further notice to the Court of Appeals or the Plaintiffs, Dominion completed its construction the Project and "energized" the transmission line. A photograph of the completed Project, taken within the National Register-listed Jamestown-Hog Island-Captain John Smith Trail Historic District, appears on the following page.

**Completed Project Within The Jamestown-Hog Island-Captain John Smith Trail**

**Historic District**



On March 1, 2019, the Court of Appeals held that the Corps' decision to approve the Project and issue of the Permit was arbitrary, capricious, and a violation of NEPA and the NHPA. *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019) ("*Semonite III*"). With respect to NEPA, the Court of Appeals found that the Project's significant impacts called for the preparation of an EIS (*id*. at 1082-88), noting that "even without blocking the view or dominating the landscape from all angles, the Project undercuts the very purpose for which Congress designated these resources: to preserve their 'unspoiled and evocative landscape[s]'" (*id*. at 1086). Further, the Corps' mitigation measures do nothing to address this issue because "they relate not to reducing the significance of the Project's visual impacts on the historic resources along the James River, but rather to periodic evaluation of the continued need for the Project itself and to more general historic preservation efforts throughout the Commonwealth." *Id*. at 1087. With respect to the NHPA, the Court of Appeals squarely rejected the Corps' assertion that Section 110(f) did not apply to the Project, and ordered the agency to "reconsider its Preservation Act analysis" accordingly. *Id.* at 1088-89. The Court of Appeals did not reach any of Plaintiffs' other claims and arguments, reasoning that the Corps would have to revisit each of the issues raised therein (including, the agency's analyses of alternatives) on remand to the agency. *Semonite III*, 916 F.3d at 1088.

Consistent with these holdings, the Court of Appeals directed that the Permit be vacated and the Corps be required to prepare an EIS. *Semonite III*, 916 F.3d at 1089. Vacatur has remained in effect from that moment onward.

On April 15, 2019, Defendants petitioned for panel rehearing and rehearing en banc. The rehearing petitions did not contest the merits of the March 1 decision, nor the

Court of Appeals' direction to prepare an EIS.  Instead, Defendants argued that the possibility of remand without vacatur should have been considered.  In response, Plaintiffs pointed out that Defendants had previously taken the position that the Project could be removed if the Corps lost on the merits.

The Court of Appeal pronounced the shift in Defendants' positions "more than a little troubling," noting that "had the Corps and Dominion said all along what they say now, either the district court or this court might have enjoined [Project] construction, in which case our consideration…would focus not on shutting down and removing the towers, but rather on prohibiting their construction-a very different balance." *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 502 (D.C. Cir. 2019) ("*Semonite IV*"). The Court of Appeals then remanded to this Court to gather evidence on "whether vacatur remains the appropriate remedy," "whether [Defendants] have forfeited or are judicially estopped from now opposing vacatur," and "the remedies necessary to protect the purpose and integrity of the EIS process." *Id*.

## **ARGUMENT**

### I.     **Judicial Estoppel Precludes Defendants From Contesting These Remedy Proceedings**

Judicial estoppel is an equitable doctrine that is designed to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal citation omitted).  It "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id*. at 749.

Although judicial estoppel is flexible and there is no specific formula for determining its application, the Supreme Court has identified three factors that "typically inform the decision whether to apply the doctrine in a particular case":  (1) whether a party's later position is clearly inconsistent with its earlier position; (2) whether the party's earlier position has been accepted; and (3) whether the party would derive an unfair advantage if not estopped.  *New Hampshire*, 532 U.S. at 750-51.  All three factors are present here.

First, Defendants have taken inconsistent positions on the question of a permanent remedy.  *New Hampshire*, 532 U.S. at 750-51.  In opposing motions to enjoin construction of the Project, Defendants argued that preliminary injunctive relief was unnecessary because the Project could be removed, and its site restored, in the event of an adverse decision on the merits.[1]  But now that they have lost on the merits, Defendants

---

[1] *See, e.g.,* Dominion Opposition to Motion for Injunction Pending Appeal (D.D.C. Case No. 17-1361) (ECF 114) at 10; Corps Opposition to Motion for Injunction Pending Appeal (D.D.C. Case No. 17-1361) (ECF 115) at 8-9; Dominion Response to Motion for

argue that this Court cannot reasonably vacate the Permit (much less remove the Project or restore its site).  Corps at 9-17; Dominion at 27-37.

Second, Defendants' earlier position was accepted (*New Hampshire*, 532 U.S. at 750-51), including by this Court.  *See* Order Denying Motion for Injunction Pending Appeals (Case No. 17-1361) (ECF 111) at 4-5.

Third, Defendants would derive an unfair advantage if not estopped.  *New Hampshire*, 532 U.S. at 750-51.  By assuring the courts that the Project could be removed in case of an adverse decision on the merits, Dominion completed construction and fundamentally changed the remedial calculus.  As the Court of Appeals explained, "[h]ad the Corps and Dominion said all along what they say now, either the district court or this court might have enjoined [Project] construction, in which case our consideration [of remedy] would focus not on shutting down and removing the [Project], but rather on prohibiting [its] construction—a very different balance indeed."  *Semonite IV*, 925 F.3d at 502.

In response, Defendants suggest that their positions have been consistent throughout this litigation.  Corps at 7-9, Dominion at 17-27.  To hear them tell it, their earlier position was that the Project "could" be removed, not that removal "would" occur. Dominion at 3, 18; *see also* Corps at 8-9.  This argument is too coy to be convincing. Defendants originally raised the possibility of removing the Project in the context of motions to enjoin construction.  To defeat those motions, they convinced this Court that construction could safely proceed because removal of the Project was not just a theoretical possibility, but a "real world" response to any adverse decision on the merits.

---

Injunction Pending Appeal (D.C. Cir. Dkt. 1740196) at 22-23; Corps Response to Motion for Injunction Pending Appeal (D.C. Cir. Dkt. 1740184) at 16.

*See, e.g.,* Order Denying Motion for Injunction Pending Appeal (Case No. 17-1361) (ECF 111) at 4-5.  Now, Defendants pretend that those prior arguments referred only to the theoretical contours of this Court's authority (Dominion at 21-22; Corps at 8) and, further, that "real world" constraints preclude any remedy other than remand without vacatur (Corps at 13-17; Dominion at 31-37).  The Court of Appeals found this change of position to be "more than a little troubling."  *Semonite IV*, 925 F.3d at 502.  This Court should do the same.

Dominion also argues that judicial estoppel should not apply because the company did not lead the courts "astray." Dominion at 23.  This argument reflects "a misunderstanding of the second [judicial estoppel] factor."  *Temple Univ. Hosp. v. Nat'l Labor Relations Bd.,* 929 F.3d 729, 735 (D.C. Cir. 2019).  The doctrine of judicial estoppel does not require Dominion's prior position to have been the but-for cause of a judicial decision.  Nor does it require Dominion to have "actively misled" the courts.  *Id.* It is enough that the company's earlier representations about removal of the Project were accepted by the courts.  *Id.* at 735-36.

Dominion further suggests that judicial estoppel does not apply here because there is no risk of inconsistent judicial determinations.  Dominion at 23-24.  In the company's view, "there will be no inconsistency if the Court orders remand without vacatur while the Corps corrects the decision-making process, because the Court ultimately still could order the [Project] removed" after remand.  Dominion at 24.  By that logic, judicial estoppel could never be applied in cases involving agency action, where a decision against the agency inherently results in remand and additional process.  The doctrine is

not nearly so narrow.  *See, e.g., Temple,* 929 F.3d at 734 (discussing second judicial estoppel factor in the context of an administrative proceeding).

Somewhat incredibly, Dominion also argues that it obtained no advantage from its earlier representations that the Project could be removed in case of an adverse decision. Dominion at 24-25.  The argument defies common sense.  The company's earlier representations clearly helped it to defeat multiple requests for injunctive relief and allowed its Project to be completed prior to the Court of Appeals' decision on the merits. Absent estoppel, this would place an impermissible "thumb on the scale" in favor of Dominion during these remedy proceedings.  *See Semonite* IV, 925 F.3d at 502 (prior representations have led to "a very different balance indeed").  It is difficult to imagine what further advantage the company might reasonably expect to gain.

For each of the reasons set forth above, judicial estoppel precludes Defendants from contesting these remedy proceedings**.**

## II.    **Vacatur Remains The Appropriate Remedy**

Even if judicial estoppel does not bar Defendants from contesting these proceedings, vacatur remains the appropriate remedy.  The NEPA and NHPA violations identified by the Court of Appeals are governed by the Administrative Procedure Act ("APA"), which provides that reviewing courts "*shall…set aside* agency action, findings, and conclusions found to be [¶] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2) (emphasis added).  Consistent with that directive, "both the Supreme Court and the D.C. Circuit Court have held that remand, *along with vacatur*, is the presumptively appropriate remedy for violation of the APA." *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) (Lamberth, J.) (emphasis added); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C.

Cir. 2001) (remedy for APA violation "normally will be a vacatur of the agency order");

*Stewart v. Azar*, 313 F. Supp. 3d 237, 272-73 (D.D.C. 2018) ("When a court concludes

that agency action is unlawful, the practice of the court is ordinarily to vacate the rule"

(citing *Ill. Pub. Telecomm. Ass'n v. Fed. Commc'n Comm'n*, 123 F.3d 693 (D.C. Cir.

1997)).

Although vacatur is the presumptive remedy for defective agency action, remand

without vacatur has been permitted only in "unusual" situations where equity demands.

*See* Administrative Conference of the United States - Final Report, *The Unusual Remedy

of Remand Without Vacatur* p. 48 (Jan. 3, 2014) (noting a "presumption against the

remedy that is consistent with a long history of routine vacation of unlawful agency

actions").  In this Circuit, the decision to permit remand without vacatur turns on two

factors derived from *Allied-Signal v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51

(D.C. Cir. 1993): "the seriousness of the [action]'s deficiencies" and "the disruptive

consequences of an interim change."

Because vacatur is the "presumptively appropriate remedy" (*Van Antwerp*, 719 F.

Supp. 2d at 78), Defendants bear the burden on both *Allied-Signal* factors.  *See* Joint

Status Report (ECF 95) at 4 (admitting same).  They have failed to carry that burden here.

As explained below, the Corps' multiple failures to comply with NEPA and the NHPA

are "serious deficiencies" (Part II.A), and the "disruptive consequences" about which

Defendants have expressed concern are speculative, self-inflicted, and insufficient to

justify remand without vacatur (Part II.B).

**A.     *Allied-Signal* Factor One:  The Corps' Multiple Failures To Comply With NEPA And The NHPA Are "Serious Deficiencies."**

The first *Allied-Signal* factor addresses "the seriousness" of the deficiencies in the agency's decision-making and thus "the extent of doubt about whether the agency chose correctly."  *Allied-Signal,* 988 F.2d at 150.  Here, the Court of Appeals found the Corps' decision-making deficient in two respects:  (1) the agency violated NEPA by failing to prepare an EIS prior to approving the Project (*Semonite III*, 916 F.3d at 1087-88); and (2) the agency erroneously concluded that the Project was not subject to Section 110(f) of the NHPA (*id*. at 1088-89).  Each violation was a fundamental error that went to the heart of the decision-making process.  Therefore, the first *Allied-Signal* factor weighs heavily in favor of vacatur.

**1.     The Corps' Failure To Prepare An EIS Before Approving The Project Was A Serious Deficiency, And The Agency Has Conceded As Much**

NEPA "declares a broad national commitment to promoting and protecting environmental quality."  *Robertson v. Methow Valley Citizens Ass'n*, 490 U.S. 332, 348 (1989).  To realize that objective, the statute establishes "a set of 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences" before making discretionary decisions.  *Id*. at 350; *see also* 40 C.F.R. §1500.1(c) ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action").  Chief among the "action-forcing procedures" is a mandate requiring federal agencies to prepare an EIS for any action that may significantly impact the environment.  42 U.S.C. §4332(2); *see also Semonite II*, 311 F. Supp. 3d. at 357 (EIS requirement is "at the heart of NEPA"); *Or. Natural Desert Ass'n v. Bureau of Land Mgmt*., 531 F.3d 1114, 1121 (9th Cir. 2008) ("The EIS is NEPA's chief tool.").  Thus, an

agency's failure to prepare an EIS before approving a project with significant environmental consequences is a "serious deficiency" in the decision-making process.

The Corps' failure to prepare an EIS here was an especially serious error.  In reviewing the significance of the Project's environmental impacts—and therefore the need to prepare an EIS—the agency was required to consider a series of regulatory "significance factors."  *See* 40 C.F.R. § 1508.27.  Any *one* of the factors could have been sufficient to require an EIS.  *Semonite III*, 916 F.3d at 1082 ("any one of the factors may be sufficient to require development of an EIS"); *see also Grand Canyon Trust v. FAA*, 290 F.3d 339, 347 (D.C. Cir. 2002) (requiring EIS based on a single factor).  The Court of Appeals found *three* factors necessitating an EIS (*Semonite III*, 916 F.3d at 1083-87), and remarked that "Congress created the EIS process" to address "situations precisely like this one" (*id*. at 1087-88).  The Corps did not challenge these characterizations.  On the contrary, the agency's petition for rehearing at the Court of Appeals explicitly conceded "the seriousness of the deficiencies" in its NEPA decision-making.  *See Semonite IV*, 925 F.3d at 501 (noting Corps' concessions).  By any reasonable measure, the Corps' failure to prepare an EIS before approving the Project was a "serious" defect.

Defendants nonetheless contend that the Corps' failure to comply with NEPA does not warrant vacatur.  Federal Defendants argue that "[s]ince the Corps has started the EIS process, and deficiencies identified in the D.C. Circuit's decision are primarily factual determinations that the agency can resolve on remand, the Corps could arrive at the same decision upon remand."  Corps at 12.  This argument misrepresents both the decision of the Court of Appeals and the nature of the Corps' NEPA violations.  The Court of Appeals held "in the clearest of terms" that the Corps violated NEPA by issuing

a FONSI and refusing to prepare an EIS.  *Semonite IV*, 925 F.3d at 500.  The agency did

not dispute that holding; instead, it acknowledged "the seriousness" of its error and

agreed to prepare an EIS.  *Id*.  In other words, this is not a case where the lead federal

agency might, on remand, revive or justify its initial determination that no EIS is needed.

*Cf. Grand Canyon Trust*, 290 F.3d at 347 (invalidating FONSI without ordering EIS).

Just the opposite.  Here, the Court of Appeals has held—and the Corps has <u>*conceded*</u>—

that the initial refusal to prepare an EIS cannot be justified.

Federal Defendants also claim that, "[i]n similar circumstances, courts have

declined to vacate agency decisions."  Corps at 12-13.  But only one of the five cases

they cite in support of that proposition has anything to do with NEPA.  *Id*.  And that case,

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91 (D.D.C.

2017), is nothing like this one.  On the merits, the *Standing Rock Sioux* court held that the

Corps "substantially complied" with NEPA before approving a new oil pipeline (*id*. at

94), and upheld "the agency's 'top-line conclusion' that the risk of an oil spill was

sufficiently low so as to not require an EIS" (*id*. at 96), but also identified "three discrete

flaws" (*id*.) to be addressed on remand.  The court then ordered remand without vacatur

because the initial decision "to produce only an EA, rather than an EIS" was likely to be

substantiated after further administrative proceedings.  *Id*. at 103.  The facts of this case

are very different.  Here, the Court of Appeals ruled against the Corps on the merits of

every single NEPA issue presented, and it explicitly directed the agency to prepare an

EIS.  *Semonite III*, 916 F.3d at 1087-88.  The Corps did not dispute the need for an EIS

(*Semonite IV,* 925 F.3d at 50), and it has now initiated the EIS process (Corps at 11).

Therefore, in contrast to *Standing Rock Sioux*, here there is no possibility that the Corps

can substantiate its prior decision "to produce only an EA, rather than an EIS." *Standing Rock Sioux,* 282 F. Supp. 3d at 103; *see also Public Employees for Environmental Responsibility v. U.S. Fish & Wildlife Serv*., 189 F. Supp. 3d 1, 5 (D.D.C. 2016) ("*PEER*") (agency's failure to "seriously contest" deficiency of EA supports vacatur).

For its part, Dominion argues against vacatur on the ground that NEPA is "a procedural statute." Dominion at 29. In the company's view, the Corps' NEPA violations do not warrant vacatur because the statute "does not compel any particular substantive outcome" (*id*.) and the agency therefore remains free to "reaffirm its substantive decision" authorizing the Project (*id*. at 30). This argument fails for two independent reasons. First, Dominion's effort to dismiss NEPA compliance as a minor, procedural technicality misrepresents the statutory scheme. Although phrased in procedural terms, NEPA's requirements are "almost certain to affect [an] agency's substantive decision." *Robertson*, 490 U.S. at 350. For that reason, the NEPA process "is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (emphasis original). After all, "[t]he idea behind NEPA is that if [an] agency's eyes are open to the environmental consequences of its actions and it considers options that entail less environmental damage, it may well be persuaded to alter what it has proposed." *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008). Adopting Dominion's proposed bright-line distinction between "procedural" and "substantive" statutes would mean that no NEPA violation, no matter how serious, could ever satisfy the first *Allied-Signal* factor. Such an outcome would be contrary to decades of case law. *See PEER*, 189 F. Supp. 3d at 2 (collecting cases and noting "the

primacy of vacatur to remedy NEPA violations").  Nor could it be squared with Congress' clear command that an EIS must be prepared *prior to* approval of a major federal action.  *See* 42 U.S.C. §4332(2).

Second, Dominion's focus on the Corps' "substantive" permitting authority (as distinguished from the agency's environmental review obligations) is misplaced.  The agency did not violate NEPA by exceeding the scope of its permitting authority; rather, it erred by refusing to prepare an EIS and issuing a FONSI instead.  *Semonite III*, 916 F.3d at 1087-88; *Semonite IV*, 925 F.3d at 500.  For purposes of the first *Allied-Signal* factor, then, the relevant question is not whether the Corps has the authority to re-approve the Project, but whether, on remand, the agency might be able to substantiate its prior decision not to prepare an EIS.  *See, e.g., Standing Rock Sioux*, 282 F. Supp. 3d at 98 ("The Court therefore must assess the likelihood that, on remand, the Corps will be able to justify its prior decision to issue an EA and FONSI, rather than preparing a full EIS"); *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) (ordering vacatur notwithstanding the agency's authority to "reissue another permit").  As explained above, the answer to that question is clear:  The Corps was ordered to prepare an EIS, has agreed to prepare an EIS, and has initiated the EIS process; thus, there can no longer be any "doubt about whether the agency chose correctly" in its initial decision-making process.  *Allied-Signal*, 988 F.2d at 150.  It did not.  The first *Allied-Signal* factor therefore favors vacatur.

> ## 2.     The Corps' Erroneous Interpretation Of NHPA Section 110(f) Was A Serious Deficiency, And Neither Defendant Has Presented Any Argument To The Contrary

Section 110(f) of the NHPA prohibits federal agencies from making any decision that may directly and adversely affect a National Historic Landmark ("NHL") without

first undertaking, to the maximum extent possible, such planning and actions as may be necessary to minimize harm. 54 U.S.C. §306107. The Corps' own studies revealed that the Project would adversely affect Carter's Grove NHL, which derives part of its historic significance and Landmark status from its setting, views, and connections to the James River. *See* AR 73896. The National Park Service ("NPS") and the Advisory Council on Historic Preservation ("ACHP"), both of which have been charged by Congress with administering the NHPA, advised the Corps that Section 110(f) should be applied to the Project. The Corps disagreed, concluding instead that Section 110(f) was inapplicable because the Project will not physically touch Carter's Grove. The Court of Appeals rejected this statutory interpretation, held that Section 110(f) applies to the Project, and ordered the Corps to reconsider its NHPA analysis. *Semonite III*, 916 F.3d at 1088-89.

The Corps' erroneous interpretation of Section 110(f) represents a "serious deficiency" in the agency's decision-making. Failing to apply a relevant legal requirement is a "major shortcoming" that justifies remand. *Humane Soc v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017). Indeed, "[w]hen an agency exercises discretion using the wrong legal standard, its action cannot survive." *Stewart*, 313 F. Supp. 3d at 272 (citing *SEC v. Chenery*, 318 U.S. 80 (1943)); *see also Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 316 F. Supp. 3d 349, 412 (D.D.C. 2018) (erroneous statutory construction is a "serious deficiency"); *NACS v. Bd. of Governors of the Fed. Reserve Sys.*, 958 F. Supp. 2d 85, 114-15 (D.D.C. 2013) (where agency misunderstood the operative statute, the first *Allied-Signal* factor "weighs heavily in favor of vacatur"). Moreover, in their motions for remand without vacatur neither Defendant presented any argument addressing the Corps' violation of Section 110(f). *See* Corps at

10-13, Dominion at 28-30.  This is a fatal error, for they bear the burden of demonstrating

that the violation was not "serious" (*see* Joint Status Report (ECF 95) at 4), and further

argument is now waived (*Walker v. Pharm. Research & Mfrs.*, 461 F. Supp. 2d 52, 58 &

n.9 (D.D.C. 2006)).  For each of these reasons, the Corps' violation of the NHPA, like its

violation of NEPA, is a "serious deficiency" that weighs heavily in favor of vacatur.

> **B.**      ***Allied-Signal* Factor Two:  The "Disruptive Consequences" Alleged By Defendants Are Speculative, Self-Inflicted, And Insufficient To Justify Remand Without Vacatur**

The second *Allied-Signal* factor addresses "the disruptive consequences" of

vacatur.  *Allied-Signal*, 988 F.2d at 150-51.  Although there is no hard and fast rule

requiring either side to prevail on both factors (*Standing Rock Sioux*, 282 F. Supp. 3d at

97), the D.C. Circuit has observed that the second factor "is weighty only insofar as the

agency may be able to rehabilitate its rationale" for the original action (*Comcast v. Fed.*

*Commc'n Comm'n*, 579 F.3d 1, 9 (D.C. Cir. 2009)).  Here, Defendants have attempted to

address the second factor by submitting a laundry list of alleged "disruptions."  Corps at

13-17; Dominion at 31-37.  But, as explained below their allegations do not withstand

scrutiny.

> **1.**      **Defendants' Hyperbolic And Inequitable Claims Of Disruption To Electric Reliability Do Not Justify Remand Without Vacatur**

Defendants' primary contention is that vacatur may create an "electric reliability

emergency" (Dominion at 34) in which hundreds of thousands of residents, hospitals,

military bases, and public services in the North Hampton Roads Load Area ("NHRLA")

could suddenly lose power, without warning, at any given moment (Corps at 16;

Dominion at 33-34).

Plaintiffs certainly understand and support the need to maintain reliable electric power.  And we agree that rolling blackouts affecting hundreds of thousands of people would constitute a major "disruption."  But a close look at the evidence presented by Defendants and their *amici* reveals that *vacatur would not, in fact, cause any such disruption*.  Moreover, any threat to electric reliability would be entirely due to Defendants' own actions.  Accordingly, Defendants' hyperbolic and inequitable claims about "rolling blackouts" do not justify remand without vacatur.

As an initial matter, it is important to note Defendants' position — or positions, rather — on the relationship between vacatur of the Permit and removal of the Project.  On one hand, Defendants have asserted that vacatur does not require the Project to be removed from service, but merely prompts the Corps to initiate an administrative process in which removal *may* be considered.  *See* Corps at 14; Dominion at 31.  On the other hand, Defendants claim that vacatur will create an electric reliability emergency in which hundreds of thousands of people could lose power without warning.  Corps at 16; Dominion at 33-34.  They cannot have it both ways.  If it is true that vacatur merely opens the door to an administrative proceeding in which removal of the Project is one of several outcomes, an "electric reliability emergency" remains entirely speculative at this time.  For this reason alone, Defendants' claims must fail.  *PEER*, 189 F. Supp. 3d at 3 (ordering vacatur where claimed "disruptions" were speculative); *see also Bldg. Ind. Def. Found. v. Norton*, 231 F. Supp. 2d 100, 106 (D.D.C. 2002) (finding alleged disruptions "too abstract" and ordering vacatur).

Furthermore, Defendants have badly mischaracterized existing measures to preserve electric reliability in the NHRLA, including PJM's Remedial Action Scheme

("RAS").  For example, the Corps describes the RAS as "call[ing] for rolling blackouts across the Hampton Roads area, which would at any given time deny power without warning to more than 169,000 electric customers."  Corps at 16.  The agency then lists a variety of public facilities—hospitals, sewage treatment plants, military bases, airports, etc.—within that group of customers, implicitly suggesting that any of them could go dark at any moment.  Corps at 16.  This account is neither accurate nor complete.  The Corps fails to disclose that the RAS would come into play only after a suite of other reliability measures (including activation of additional "demand response" electric generation) have already been deployed.  *See, e.g.,* Declaration of Steven Herling (ECF 106-4) at ¶17.  Thus, the RAS is only "armed" in rare and specific circumstances when demand is extremely high, other reliability measures are already in effect, and an existing power plant (here, a plant known as "Yorktown 3") is unavailable.  *See, e.g.,* Herling Dec. at ¶¶14-16.[2]  Once "armed," the RAS may or may not be "triggered."  *Id.*  And even in the unlikely event that it is "triggered," the RAS would result in "controlled, rotating outages" for "a limited period of time," not the apocalyptic scenario described by the Corps.  *Compare* Herling Dec. at ¶15 *with* Corps at 16.

For context, neither Dominion nor the Corps has identified a single blackout related to the RAS during the environmental review, construction, or litigation relating to the Project.  *See* Dominion at 6-7 (no evidence of blackouts; RAS "armed" just once).

---

[2] The declaration accompanying PJM's *amicus* brief identifies two criteria for "arming" the RAS.  Herling Dec. at ¶ 16.  The first criterion involves one of two "high demand" scenarios.  *Id.*  The second criterion involves the unavailability of the Yorktown 3 power plant.  *Id.*  Although not entirely clear, the declaration seems to suggest that the first criterion was met on 20 days in 2016, 9 days in 2017, and 20 days in 2018.  *Id.*  However, the declaration provides no information on the number of days on which both criteria were simultaneously satisfied—*i.e.,* the number of times the RAS was actually "armed".  *Id.*

This is important because peak power loads in the relevant area of Virginia, both actual and forecast, are _significantly lower_ than they were when the Project was initially proposed in 2012.[3]  At the time of the original proposal, PJM's Regional Transmission Expansion Plan ("RTEP") forecast that the summer peak power load would be 1708 megawatts ("MW") in 2020.  Declaration of Richard Tabors at ¶ 3.  But PJM's 2019 RTEP now forecasts just 1407 MW of summer peak power load by 2023.  _Id_.  The decrease is even more dramatic in PJM's filings with the Federal Energy Regulatory Commission ("FERC").  In 2012, PJM's FERC filings projected summer peak power flows of 1600 MW in 2012, 1663 MW in 2013, and 1871 MW in 2022.  Tabors Dec. at ¶ 4.  In PJM's 2019 FERC filings, however, peak summer power loads are projected to be just 1397 MW in 2019 and 1412 MW in 2028.  _Id_.  Regardless of which data source is used, it is clear that peak power demand—the primary driver of Dominion's stated need for the Project, as well as its concerns about grid reliability—is _steeply declining_ in the NHRLA.[4]  Indeed, PJM, hardly a neutral participant in these proceedings,[5] has gone out

---

[3] In fact, PJM revised its load forecasting model in 2016 to account for consistent and significant over estimations of load growth. _See_ Note 4, _infra_. Relatedly, Dominion's load forecasts dating back to 2012 have been determined to be unreliably high by the Virginia State Corporation Commission ("SCC"). Each year Dominion files with the SCC an Integrated Resource Plan ("IRP"), which forecasts future load. In December, 2018, the SCC rejected Dominion's IRP as not in the public interest and found that "the load forecasts contained in the Company's past IRPs have been consistently overstated, particularly in years since 2012, with high growth expectations despite generally flat actual results each year." _See_ Virginia Electric and Power Company's Integrated Resource Plan, Case No. 2018-PUR-00065 (Dec. 7, 2018) at 6, _available at_ http://www.scc.virginia.gov/docketsearch/DOCS/4d5g01!.PDF (last visited Aug. 15, 2019).

[4] The steep drop in demand within the NHRLA mirrors similar trends across the PJM region and nationwide.  This was one of the reasons why PJM chose to revise its load forecasting model in 2016.  _See_ PJM Load Forecasting Model Whitepaper (April 27, 2016) _available at_ https://www.pjm.com/~/media/library/reports-notices/load-

of its way to clarify that blackouts would not necessarily occur even if the Project were completely removed.  PJM at 6-7 ("PJM does not suggest that operation of the [RAS] would be inevitable if the [Project] became unavailable").

Moreover, any impact on electric reliability in the NHRLA would be attributable to Dominion's own inequitable behavior.  Throughout this litigation, power plants known as "Yorktown 1" and "Yorktown 2," operating pursuant to a Department of Energy ("DOE") order, served as a "backstop" assuring grid reliability in the Project's absence. On March 1, 2019, the Court of Appeals held that the Corps violated NEPA and the NHPA and vacated the Permit.  One week later, ***with full knowledge that the Project was unlawful and the Permit had been vacated***, Dominion and PJM reached a decision to decommission Yorktown 1 and 2.  Herling Dec. at ¶ 11.  In doing so, they removed the "backstop" which had guaranteed electric reliability up to that point.  Now, Dominion contends the absence of that same backstop—*i.e.,* the Yorktown units—requires remand without vacatur.  Dominion at 32-33.

But remand without vacatur is an equitable remedy.  *See Fertilizer Inst. v. U.S. EPA*, 935 F.2d 1303, 1313 (D.C. Cir. 1991).  And "he who comes into equity must come

---

forecast/2016-load-forecast-whitepaper.ashx ("the accuracy of the PJM model decayed noticeably, with a trend towards over-forecasting. Each successive load forecast tended to be lower for a given year than the forecast  produced  one  year  prior").

[5] Although technically an "independent" regional transmission organization, PJM is in fact a limited liability company in which one of Dominion's parent companies (1) is a member, (2) has made a capital contribution, and (3) maintains a sizeable interest.  *See* Corporate Disclosure Statement of PJM Interconnection, LLC (ECF 106-1) at 1-2. Perhaps not surprisingly, PJM has loyally supported Dominion by filing amicus briefs at multiple stage of this litigation.  *See* Motion for Leave to File Amicus Curiae Brief (D.D.C. Case No. 17-1574) (ECF 58) (amicus in support of Dominion's motion for summary judgment); Amicus for Appellee Brief (D.C. Cir. Case No. 18-5179, Dkt. 1754107) (amicus in support of Dominion's appellate brief); Motion for Leave to File Amicus Curiae Brief on Remand (D.D.C. Case No. 17-1574) (ECF 106) (amicus in support of Dominion's motion for remand without vacatur).

with clean hands." *Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co*., 324 U.S. 806, 814-15 (1945).  Here, Dominion's hands are anything but clean.  By working (with PJM) to decommission Yorktown 1 and 2 before these remedy proceedings could begin, the company created the alleged reliability risks on which its motion for remand without vacatur now relies.  The Court should not reward Dominion's gamesmanship.  "No party has the right [ ] to create problems by its devious and deceitful conduct and then approach a court of equity with a plea that…its rights be declared as if it had acted in good faith throughout." *New York Football Giants v. Los Angeles Chargers Football Club*, 291 F.2d 471, 474 (5th Cir. 1961).

Dominion's self-serving complaints about the condition of Yorktown 1 and 2 (Dominion at 32-33) do not alter the equitable balance.  On the contrary, they highlight the *in*equitable character of Dominion's actions.  The company had responsibility and control over the maintenance of Yorktown 1 and 2 at all relevant times.  There is no evidence that it lacked the technical ability or economic resources to continue to repair and maintain those facilities until the completion of these remedy proceedings (at the very least).  Nor is there any defensible reason for the company's failure, during the period between the Court of Appeals' March 1 merits ruling and the company's March 8 decommissioning approval, to disclose the imminent shutdown of the Yorktown units.  As the ancient maxim directs, "one who seeks equity must do equity." *New York City v. Pine*, 185 U.S. 93, 107 (1902).  Dominion's failure to "do equity" here precludes the equitable remedy of remand without vacatur.

In sum, Defendants' concerns about disruption of electric reliability fail to justify remand without vacatur for each of three reasons.   First, Defendants electric reliability

arguments are fatally undermined by their own contention that vacatur does not require removal of the Project from the James River.  If vacatur does not compel removal, it does not disrupt electric reliability either.  Second, Defendants have overstated potential disruptions by mischaracterizing the RAS and failing to address the steep decline of actual and projected peak power loads within the NHRLA.  And third, to the extent any risk of disruption actually exists, it is entirely attributable to Dominion's inequitable choice to decommission Yorktown 1 and 2 in the face of an adverse decision from the Court of Appeals.

### 2. Federal Defendants' Concerns About Administrative Inconvenience Do Not Justify Remand Without Vacatur

Federal Defendants argue that vacatur is inappropriate because it would "frustrate the Corps' efforts to timely issue the EIS ordered by the D.C. Circuit."  Corps at 13. Although not entirely clear, the agency's concern seems to be that vacatur might lead to additional administrative proceedings under the Clean Water Act ("CWA") or Rivers and Harbors Act ("RHA"), and those proceedings, in turn, might distract from the EIS.  *Id*. at 13-14.  If that is indeed the Corps' position, it is a weak one.  The agency appears to be laboring under the mistaken impression that it cannot be expected to comply with NEPA while also carrying out duties under other federal statutes.  But the law requires just that. *See, e.g.,* 40 C.F.R. §1500.6 (NEPA obligations mandatory absent explicit statutory conflict), §1501.2(d) (agency must commit resources to NEPA compliance).  In fact, agencies are affirmatively obligated to integrate NEPA compliance with their other statutory duties.  40 C.F.R. §1500.2(c); *see also* 40 C.F.R. §1502.1 (NEPA must be "infused into the ongoing programs and actions of the Federal Government").  And there is no reason to believe the Corps cannot comply with NEPA, the CWA, and the RHA at

the same time:  Every year, the agency prepares multiple EISs while simultaneously

conducting scores of CWA and RHA proceedings.[6]  The Corps' speculative claims of

administrative inconvenience are unsupported by any evidence, and do not justify remand

without vacatur.  *See PEER*, 189 F. Supp. 3d at 4 (rejecting similar claim).

   For similar reasons, there is no merit to the Corps' contention that the Project's

RHA authorization should be left in place even if other aspects of the Permit are vacated.

*See* Corps at 13-15.  The agency's primary concern seems to be that vacatur of the RHA

authorization might lead to additional administrative proceedings under that statute.  But,

as already discussed, this is not the kind of "disruption" that can justify a departure from

the presumptive APA remedy of vacatur.  *See PEER*, 189 F. Supp. 3d at 4 ("If this

argument were enough to carry the day, then it seems vacatur would never be

appropriate").

   Nor, for that matter, is there anything administratively "inequitable" (Corps at 15)

about vacatur of the RHA authorization.  The Corps, not the Plaintiffs, elected to

combine the Project's RHA, CWA, NEPA, and NHPA compliance into a single decision

document.  *See* AR798-909.  The agency remains free to raise any concerns it may have

---

[6] The Corps has issued Federal Register notices initiating the preparation of 11 EISs (so far) in 2019.  *See* 84 Fed. Reg. 29177 (June 21, 2019); 84 Fed. Reg. 19060 (May 3, 2019); 84 Fed. Reg. 12596 (Apr. 2, 2019); 84 Fed. Reg. 12598 (Apr. 2, 2019); 84 Fed. Reg. 12599 (Apr. 2, 2019); 84 Fed. Reg. 12601 (Apr. 2, 2019); 84 Fed. Reg. 12602 (Apr. 2, 2019); 84 Fed. Reg. 12237 (Apr. 1, 2019); 84 Fed. Reg. 9509 (Mar. 15, 2019); 84 Fed. Reg. 2835 (Feb. 8, 2019); 84 Fed. Reg. 1082 (Feb. 1, 2019).  The agency also initiated 11 EISs in 2018 and 11 more in 2017.  Although public information about the Corps' investigation and enforcement actions is more difficult to obtain, the agency's 2019 budget request identified 24 ongoing investigations and its 2018 request identified 40.  *See* "2019 Budget Justification" *available at* https://cdm16021.contentdm.oclc.org/digital/collection/p16021coll6/id/2045 (last visited Aug. 14, 2019); "2018 Budget Justification" *available at* https://cdm16021.contentdm.oclc.org/digital/collection/p16021coll6/id/1852 (last visited Aug. 14, 2019).  This data is more than enough to confirm that the agency is perfectly capable of complying with NEPA, the CWA, and the RHA at the same time.

about "disruptions" arising from further proceedings under the RHA.  *Cf.* Corps at 15.

And, contrary to the Corps' unsupported assertion (*see id.*), there is no requirement that a

NEPA plaintiff must allege separate, parallel claims for relief under a defendant agency's

permitting statutes.

### 3. Dominion's Self-Inflicted Economic Injuries Do Not Justify Remand Without Vacatur

Dominion complains that vacatur is inappropriate because deconstructing the

Project would involve "at least another 13 months at a cost of approximately $46

million." Dominion at 36.  The complaint rings hollow in light of the company's position

that vacatur would not, in fact, require the Project to be removed.  Dominion at 31.  If

vacatur does not require removal, there is no reason why the cost of removal should

preclude vacatur.

Moreover, any economic injuries associated with vacatur would be entirely self-

inflicted.  Dominion decided to proceed with the Project at its own risk, with full

knowledge that this litigation remained pending.  In doing so, it assumed the economic

risk of an adverse result.  *Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 116 (D.D.C.

2003); *see also Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir.

2001) (rejecting claims of economic harm where all parties had notice of ongoing

litigation); *Standing Rock Sioux*, 282 F. Supp. 3d at 104 (project proponent "assumed

some risk of economic disruption" by constructing project during litigation).

### 4. Dominion's Speculative Concerns About "Uncertainty" Do Not Justify Remand Without Vacatur

Dominion also raises concerns about several types of "uncertainty":  uncertainty

about "the fate of the [James River] crossing" (Dominion at 31); uncertainty about

"whether and how DOE's emergency authority could be implicated if the Permit is

vacated" (*id*. at 32); uncertainty about whether the DOE "could or would exercise its authority to order continued operation of the Project" (*id*. at 33); and uncertainty about mitigation funding (*id*. n.11).  But the company has not identified any authority for the proposition that "uncertainties" are enough to justify a departure from the presumptive APA remedy of vacatur.  Dominion at 31-33.  Indeed, the case law points the other way. *See, e.g., Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 22 (D.D.C. 2014) (rejecting claim that vacatur would create a "confused and uncertain" regulatory situation); *Reed v. Salazar*, 744 F. Supp. 2d 98, 120 (D.D.C 2010) (operational complexity does not justify remand without vacatur); *Nat'l Ski Areas Ass'n v. U.S. Forest Serv*., 910 F. Supp. 2d 1269 (D. Colo. 2012) ("the burden is on the [agency] to put forth a factual basis, and not just conclusory policy statements, for any 'disruptive consequences' that it alleges could result.").[7]

### 5.      The Prospect Of Future Relief Does Not Justify Remand Without Vacatur

Citing *Public Employees for Environmental Responsibility v. Hopper*, 827 F.3d 1077 (D.C. Cir. 2016) ("*Hopper*"), Dominion argues that vacatur is inappropriate at this time because Plaintiffs may be able to secure relief through the EIS process.  Dominion at 30.  But *Hopper* is readily distinguishable.  There, vacatur was determined unnecessary because the project at issue could not be built—and therefore no environmental harm could occur—until after the lead agency issued a proper EIS.  *Hopper*, 827 F.3d at 1084.

---

[7] In fact, some of the "uncertainties" identified by Dominion weigh *in favor of vacatur*. For example, uncertainty about whether the Department of Energy might permit the Yorktown 1 and 2 plants to resume operation (Dominion at 32) undercuts the company's suggestion that potential disruptions to grid reliability require remand without vacatur (Dominion at 33-35).  *See Otay Mesa L.P. v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 355, 379 (D.D.C. 2018) (existence of regulatory means of mitigating disruption weighs in favor of vacatur); *PEER*, 189 F. Supp. 3d at 5 (availability of alternative means of managing disruption counsels in favor of vacatur).

Here, vacatur is warranted precisely because Dominion's Project has already been built without a proper EIS, and significant environmental harm is ongoing.

### 6. Defendants' Failure To Address Ongoing Environmental Harm Weighs Against Remand Without Vacatur

Rather than confronting the ongoing environmental harm caused by the Project, Defendants instead speculate about the potential environmental impacts of Project removal.  Corps at 17; Dominion at 33.  Here, again, they are trying to have it both ways.  Under Defendants' theory of the case, vacatur merely opens the door to administrative proceedings in which removal of the Project is but one of several outcomes.  Corps at 14, Dominion at 36-37.  If that is true, the (alleged) environmental consequences of Project removal cannot possibly weigh against vacatur.

In the alternative, if Defendants believe vacatur does in fact mandate removal of the Project, they cannot meet their burden without demonstrating that the environmental consequences of Project removal outweigh the environmental consequences of maintaining the Project in place (*Friends of the Capital Crescent Trail v. FTA*, 218 F. Supp. 2d 53, 60 (D.D.C. 2016)), a doubtful proposition in light of the Court of Appeals' findings about the significance of the Project's impacts.  *See Semonite III*, 916 F. 3d at 1086 ("the Project undercuts the very purpose for which Congress designated these resources:  to preserve their 'unspoiled and evocative landscapes"); *Van Antwerp*, 719 F. Supp. 2d at 78-80 ("vacatur is appropriate in order to prevent significant harm resulting from keeping the agency's decision in place").  Either way, Defendants' exclusive focus on speculative, future environmental disruptions associated with Project removal cannot justify remand without vacatur.

### C.     Vacatur Will Protect The Purpose And Integrity Of The EIS Process

The Court of Appeals explicitly directed this Court to "determine the remedies necessary to protect the purposes and integrity of the EIS process." *Semonite IV*, 925 F. 3d at 502.  Defendants do not seem to have gotten the message.  Their briefs say nothing about the purposes of the EIS process, and provide no reason to believe the integrity of that process will be respected.  On the contrary, Defendants seem to be treating the Corps' EIS as a *pro forma* paperwork exercise that will inevitably reauthorize the Project. *See, e.g.,* Dominion at 30 (suggesting the EIS "is likely to confirm" an absence of alternatives).  Therefore, Defendants' motions should be denied for the additional reason that vacatur is necessary to ensure thorough, full and fair consideration of all impacts and alternatives in the EIS process.

In implementing the Court of Appeals' direction to safeguard the purpose and integrity of the EIS process, five points bear particular emphasis.  First, NEPA compliance is not a procedural technicality or a paperwork exercise.  The purpose of the statute "is not to generate paperwork—even excellent paperwork—but to foster excellent action."  40 C.F.R. §1500.1(c).  The requirement to prepare an EIS is "action-forcing," and, although phrased in procedural terms, is intended "to affect [an] agency's substantive decision."  *Robertson*, 490 U.S. at 350.

Second, and relatedly, one of the central objectives of NEPA is to ensure "that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise case."  *Robertson*, 490 U.S. 349. Accordingly, the purpose of an EIS is to "serve practically as an important contribution to the decisionmaking process," not to "rationalize or justify decisions already made."  40 C.F.R. §1502.5.

Third, historic resources are central to NEPA.  The purposes of the statute explicitly include "preserv[ation of] important historic, cultural, and natural aspects of our national heritage" and "assur[ing] for all Americans…esthetically and culturally pleasing surroundings."  42 U.S.C. §4331(b).  An agency's decision about whether to prepare an EIS must account for potential impacts historic and cultural resources.  40 C.F.R. §1508.27(b)(8).  And every EIS must fully address "aesthetic, historic, and cultural" impacts, whether direct, indirect, of cumulative.  40 C.F.R. §40 C.F.R. 1508.8.

Fourth, analysis of alternatives is the "heart" of the EIS, and requires the lead agency "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R.  §1502.14.  Here, there is substantial evidence that a full and fair exploration of alternatives—including alternatives not previously considered by the Corps—will identify feasible options capable of accommodating both grid reliability and the preservation of historic resources.  For example:

- As noted above, peak electricity loads (both actual and forecasted) within the NHRLA are much lower they were when the Project was proposed in 2012.

- The Project was originally proposed as a response to the federal Mercury Air Toxics Standard ("MATS").  The United States Environmental Protection Agency ("EPA") has now issued a proposed rule finding that MATS is no longer "appropriate and necessary" under the Clean Air Act. 84 Fed. Reg. 2670, 2672 (Feb. 7, 2019).

- A new natural gas power plant is projected to be built in Charles City County, Virginia, significantly increasing local power generation.[8]

Fifth, unfortunately, there is also substantial evidence that the Corps may not be committed to a rigorous, objective evaluation of the effects of, and alternatives to, the

[8] *See* Charles City Combined-Cycle Power Project *available at* https://www.power-technology.com/projects/charles-city-combined-cycle-power-project-virginia/ (last visited Aug. 15, 2019).

Project.  For example, in its Petition for Rehearing at the Court of Appeals, the Corps suggested that completion of the Project makes it no longer "practical" for the agency to "serve NEPA's goals of…consider[ing] all alternatives."  Corps Petition for Rehearing (D.C. Cir. Dkt 1782986) at 8.  Moreover, the Corps has now suggested that it plans to complete the EIS process in just 10 months, even though it previously asserted that a proper EIS would be so costly and time-consuming as to be infeasible.  Compare Corps at 11 with AR 908.

Each of these five points confirms that vacatur will protect the purpose and integrity of the EIS process by ensuring that the Corps fully and fairly evaluates all issues, impacts, and alternatives, under NEPA and the NHPA, before committing to a new course of action.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that Defendants'

motions for remand without vacatur be denied.  A proposed order is submitted herewith.

Respectfully submitted this 15th day of August, 2019.

                                     */s/ Matthew G. Adams*

                                   Matthew G. Adams (*pro hac vice*)
                                   Jessica L. Duggan (*pro hac vice*)
                                   Samuel Kohn, D.C. Bar No. 1023158
                                   Dentons US LLP
                                   One Market Plaza, Spear Tower, 24th Floor
                                   San Francisco, CA  94105
                                   (415) 882-0351
                                   matthew.adams@dentons.com
                                   jessica.duggan@dentons.com
                                   samuel.kohn@dentons.com

                                   Elizabeth S. Merritt, D.C. Bar No. 337261
                                   Sharee Williamson, D.C. Bar No. 990497
                                   National Trust for Historic Preservation
                                   2600 Virginia Ave. NW, Suite 1100
                                   Washington, DC 20037
                                   202-297-4133
                                   emerritt@savingplaces.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2019, I caused service of the foregoing Plaintiffs' Opposition to Defendants' Motion for Remand Without Vacatur be made by filing it with the Clerk of the Court via the CM/ECF System, which sends a Notice of Electronic Filing to all parties with an e-mail address of record who have appeared and consented to electronic service. To the best of my knowledge, all parties to this action receive such notices.

*/s/ Matthew G. Adams*

Matthew G. Adams (*pro hac vice*)
Dentons US LLP
One Market Plaza
Spear Tower, 24th Floor
San Francisco, CA  94105
(415) 882-0351
matthew.adams@dentons.com
