**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, *et al.*, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 17-cv-01574-RCL |
| | ) | |
| TODD T. SEMONITE, Lieutenant General, U.S. Army Corps of Engineers, *et al.*, | ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VIRGINIA ELECTRIC & POWER COMPANY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

**PLAINTIFFS' SUR-REPLY IN OPPOSITION TO DEFENDANTS'**
**MOTIONS FOR REMAND WITHOUT VACATUR**

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 2

I.      Judicial Estoppel Precludes Defendants From Contesting These Remedy
        Proceedings ................................................................................................... 2

II.     Vacatur Remains The Appropriate Remedy ................................................... 4

        A.      *Allied-Signal* Factor One:  The Corps' Multiple Failures To Comply With
                NEPA And The NHPA Are "Serious Deficiencies" .................................... 5

                1.      The Corps' Failure To Prepare An EIS Was A Serious Deficiency ............. 5

                2.      The Corps' Erroneous Interpretation Of NHPA Section 110(f) Was A
                        Serious Deficiency .................................................................................... 8

        B.      *Allied-Signal* Factor Two:  "Disruptive Consequences" Do Not Justify
                Remand Without Vacatur ......................................................................... 9

                1.      Defendants' Claims of Disruption to Electric Reliability Do Not Justify
                        Remand Without Vacatur ........................................................................ 10

                2.      The Corps' Claims of Administrative Inconvenience Do Not Justify
                        Remand Without Vacatur ........................................................................ 16

                3.      Defendants' Remaining Claims of Disruption Do Not Justify Remand
                        Without Vacatur ...................................................................................... 17

        C.      Vacatur Will Protect The Purpose And Integrity Of The EIS Process ...................... 18

CONCLUSION ......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*\*Allied-Signal v. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) ...................................................................................... *passim*

*Backcountry Against Dumps v. Perry,*
   No. 12-CV-3062, 2017 U.S. Dist. Lexis 139090 (S.D. Cal. Aug. 29, 2017)............................8

*Bender v. Jordan,*
   439 F. Supp. 2d 139 (D.D.C. 2006) ..........................................................................................4

*Bldg. Indus. Legal Def. Found. v. Norton,*
   231 F. Supp. 2d 100 (D.D.C. 2002) ...............................................................................10,11

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ...................................................................................................3

*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014) .................................................................................................18

*Fertilizer Inst. v. U.S. Envtl. Protection Agency,*
   935 F.2d 1303 (D.C. Cir. 1991) ...............................................................................................14

*Greater Yellowstone Coal. v. Bosworth,*
   209 F. Supp. 2d 156 (D.D.C. 2002) ...........................................................................................7

*Humane Soc'y v. Johanns,*
   520 F. Supp. 2d 8 (D.D.C. 2007) ........................................................................................7, 19

*Nat'l Parks Conservation Ass'n v. Jewell,*
   62 F. Supp. 3d 7 (D.D.C. 2014) ...............................................................................................10

*Nat'l Parks Conservation Ass'n v. Semonite,*
   916 F.3d 1075 (D.C. Cir. 2019) ..................................................................................... *passim*

*Nat'l Parks Conservation Ass'n v. Semonite,*
   925 F.3d 500 (D.C. Cir. 2019) ......................................................................................6, 19, 20

*New Hampshire v. Maine,*
   532 U.S. 742 (2001)......................................................................................................2, 3

*New York City v. Pine,*
   185 U.S. 93 (1902)......................................................................................................16

*O'Donnell Constr. Co. v. District of Columbia,*
   963 F.2d 420 (D.C. Cir. 1992) ...................................................................................................3

*Oglala Sioux Tribe v. Nuclear Reg. Comm'n,*
    896 F.3d 520 (D.C. Cir. 2018) .................................................................6, 7, 19

*Otay Mesa L.P. v. U.S. Dep't of the Interior,*
    344 F. Supp. 3d 355 (D.D.C. 2018) ........................................................16

*Public Emp. for Envtl. Responsibility v. Hopper,*
    827 F.3d 1077 (D.C. Cir. 2016) ..............................................................17

*Public Emp. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.,*
    189 F. Supp. 3d 1 (D.D.C. 2016) ...................................................... *passim*

*Robertson v. Methow Valley Citizens' Ass'n,*
    490 U.S. 332 (1989) ................................................................................18

*Sierra Club v. Army Corps of Eng'rs,*
    645 F.3d 978 (8th Cir. 2011) ..................................................................18

*Sierra Club v. Army Corps of Eng'rs,*
    803 F.3d 31 (D.C. Cir. 2015) ..............................................................5, 18

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs,*
    282 F. Supp. 3d 91 (D.D.C. 2017) ...........................................................7

*Sugar Cane Growers Coop. v. Veneman,*
    289 F.3d 89 (D.C. Cir. 2002) ....................................................................4

*WildEarth Guardians v. Zinke,*
    368 F. Supp. 3d 41 (D.D.C. 2019) ............................................................7

**Statutes**

42 U.S.C. § 4331(b) ........................................................................................18

**Regulations**

40 C.F.R.
    § 1502.5......................................................................................................18
    § 1502.14.............................................................................................18, 20
    § 1506.5......................................................................................................17

## **GLOSSARY**

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **Corps** | United States Army Corps of Engineers |
| **DOE** | United States Department of Energy |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **Dominion** | Virginia Electric & Power Company |
| **FONSI** | Finding of No Significant Impact |
| **MATS** | Mercury Air Toxics Standard |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National Historic Preservation Act |
| **NHRLA** | North Hampton Roads Load Area |
| **PJM** | PJM Interconnection, LLC |
| **RAS** | Remedial Action Scheme |
| **SCC** | Virginia State Corporations Commission |

## **<u>INTRODUCTION</u>**

Three undisputed facts require this Court to vacate the Permit granted by the United States Army Corps of Engineers ("Corps") to Virginia Electric & Power Company ("Dominion") for the Surry-Skiffes Creek-Whealton project ("Project"):

First, the National Environmental Policy Act ("NEPA") requires an Environmental Impact Statement ("EIS") for the Project, and the Corps has agreed to prepare one.

Second, the Project is subject to Section 110(f) of the National Historic Preservation Act ("NHPA"), and the Corps has agreed to comply.

Third, vacatur of the Permit does not automatically require the Project to be removed from service.

The first and second facts demonstrate that the Corps will not substantiate its previous Finding of No Significant Impact ("FONSI") or its prior determination that Section 110(f) is inapplicable to the Project. The third fact confirms that vacatur will not result in substantial disruption. Therefore, Defendants cannot meet either prong of this Circuit's two-part test for remand without vacatur.

Moreover, even if Defendants could meet the legal requirements of the two-part test, the principles of equity would bar any relief. Judicial estoppel disqualifies Defendants from contesting these remedy proceedings, while the doctrine of unclean hands prevents them from realizing any benefit from Dominion's inequitable conduct.

## ARGUMENT

### I.      Judicial Estoppel Precludes Defendants From Contesting These Remedy Proceedings

The doctrine of judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (citation omitted).  More specifically, it "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id*. at 749.

As we previously explained, judicial estoppel is essential to protect the integrity of these proceedings because Defendants have taken inconsistent positions on the issue of remedy.  *See* Plaintiffs' Opposition to Motion for Remand Without Vacatur (ECF 110) ("NTHP Opp.") at 7-10.  In successfully opposing earlier motions to enjoin construction, Defendants argued that any Project-related harm could be remedied if Plaintiffs were to prevail on the merits.  *Id*.  But now that Plaintiffs have, in fact, prevailed on the merits, Defendants argue that the remedy must be limited to remand without vacatur, notwithstanding the significant and ongoing environmental harm associated with such an outcome.  *See* Corps Motion for Remand Without Vacatur (ECF 108) ("Corps Motion") at 9-17; Dominion Memorandum in Support of Motion for Remand Without Vacatur (ECF 107-1) ("Dominion Motion") at 27-37.

In reply, the Corps and Dominion pretend that their position on remedy has remained unchanged throughout this litigation.  Corps Reply in Support of Motion for Remand Without Vacatur (ECF 112) ("Corps Reply") at 2-3; Dominion Reply in Support of Motion for Remand Without Vacatur (ECF 111) ("Dominion Reply") at 5-7.  Parsing prior representations word by word, they propose various ways in which individual statements they made during the preliminary injunction phase of this case might be interpreted consistently with their positions in

the current remedy proceeding.  *Id*.  But this blinkered, hyper-technical wordplay misses the forest for the trees.  When the full picture is considered, the inconsistency in Defendants' positions is quite clear.  The Corps and Dominion previously assured this Court that allowing construction to proceed during litigation would not limit the availability of remedies — up to and including complete removal of the Project — if Plaintiffs were to prevail on the merits.  Now that Plaintiffs have prevailed on the merits, they claim that remand without vacatur is the only feasible remedy.

Dominion seeks to explain away this inconsistency by invoking "the context" of its prior representations.  Dominion Reply at 6.  In the company's view, judicial estoppel would be inappropriate because its prior arguments were not directed to the topic of vacatur, but instead to the preliminary injunction standard articulated in *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006).  *See id*.  Not so.  Indeed, a close look at *Chaplaincy of Full Gospel Churches* demonstrates precisely why judicial estoppel is warranted here.

*Chaplaincy of Full Gospel Churches* stands for the proposition that preliminary injunctive relief is only appropriate if, in the absence of an injunction, the moving party would suffer an injury that is "beyond remediation."  454 F.3d at 297.  The "beyond remediation" standard refers to "the ordinary course of litigation."  *Id*. at 297-98 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Thus, harm may be beyond remediation if future remedies are hypothetical, speculative, or impractical.  *See, e.g., O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 428-29 (D.C. Cir. 1992) (practical difficulty of obtaining future relief "weighs heavily" in favor of preliminary injunction).  And, consistent with this pragmatic approach, the "beyond remediation" standard is satisfied if, without a preliminary

injunction, it might become "impossible to unscramble the eggs" after a determination on the merits. *See, e.g., Bender v. Jordan*, 439 F. Supp. 2d 139, 177 (D.D.C. 2006) (quotation omitted).

Thus, Defendants' previous argument and reliance on the "beyond remediation" standard must be viewed as a representation that (1) an appropriate remedy for Project-related harm *does* exist "in the ordinary course of litigation" (*Chaplaincy of Full Gospel Churches,* 454 F.3d at 297-98); and (2) Project construction would *not* make it "impossible to unscramble the egg" (*Bender*, 439 F. Supp. 2d at 177). In these remedy proceedings, however, Defendants have (1) filed motions opposing the "ordinary" Administrative Procedure Act ("APA") remedy of vacatur; and (2) filed briefs relying heavily on cases like *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002), where remand without vacatur was ordered precisely because "the egg ha[d] been scrambled" (*id*. at 97) in a way that precluded other relief. *See, e.g.,* Corps Motion at 2, 3, 9; Dominion Motion at 13, 14, 22, 29; Corps Reply at 3, 4, 6; Dominion Reply at 14 (all invoking *Sugar Cane Growers*).[1]

In light of this clear inconsistency between Defendants' position in the preliminary injunction proceedings and their position in these remedy proceedings, this Court should apply the doctrine of judicial estoppel to protect the integrity of the judicial process and to avoid conflict with settled law governing preliminary injunctive relief.

## II.   Vacatur Remains The Appropriate Remedy

Even if judicial estoppel did not bar Defendants from contesting these remedy proceedings, vacatur would remain the appropriate remedy pursuant to the two-factor test set out in *Allied-Signal v. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993).

---

[1] Indeed, the vast majority of the Corps' Motion for Remand Without Vacatur consists of an argument titled "Vacatur is Unwarranted Under *Allied-Signal* and *Sugar Cane Growers.*" Corps Motion at 9-17 (emphasis added). And Dominion's Motion for Remand Without Vacatur marks *Sugar Cane Growers* with an asterisk, a designation reserved for "those cases or authorities on which counsel chiefly relies" pursuant to Local Rule 7(a). *See* Dominion Motion at iv.

## A.    *Allied-Signal* Factor One:  The Corps' Multiple Failures To Comply With NEPA And The NHPA Are "Serious Deficiencies"

The first *Allied-Signal* factor addresses "the seriousness" of the deficiencies in the Corps' decision-making and whether, on remand, the agency can substantiate its previous decision-making.  *Allied-Signal*, 988 F.2d at 150-51.  Here, the Corps' violations of NEPA and the NHPA were indeed "serious deficiencies," *and Defendants have effectively conceded as much*.

### 1.    The Corps' Failure To Prepare An EIS Was A Serious Deficiency

The Court of Appeals held that the Corps violated NEPA by failing to prepare an EIS on the Project, noting that "Congress created the EIS process to provide robust information in situations precisely like this one."  *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1087 (D.C. Cir. 2019) ("*Semonite III*").  For purposes of the first *Allied-Signal* factor, then, the "deficiency" at issue is the agency's erroneous decision to issue an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), rather than preparing a full EIS.  *Id.*

Our Opposition to Defendants' motions for remand without vacatur explained that this deficiency was "serious" for each of three reasons.  First, since the requirement to prepare an EIS on any project that may significantly impact the environment is "at the heart of NEPA" (*Sierra Club v. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015)), failure to comply is a serious deficiency — particularly where, as here, an EIS was called for by multiple regulatory factors (NTHP Opp. at 12-13).  Second, the Corps has admitted the seriousness of the deficiencies found by the Court of Appeals (*id*. at 13).  And third, the Corps has agreed to prepare a full EIS on remand, thereby conceding that it cannot substantiate its original decision to issue a FONSI (*id*. at 13-14, 16).

Defendants offer little in the way of reply.  They do not dispute that the requirement to prepare an EIS is at the heart of NEPA.  Corps Reply at 3-6; Dominion at 13.[2]  They ignore that the Corps' failure to prepare an EIS here was contrary to multiple regulatory factors, and therefore particularly egregious.  *Id.*  They do not disagree that the Corps previously acknowledged "the seriousness of the deficiencies" found by the Court of Appeals.  *Id.*; *see also* Corps Petition for Rehearing (D.C. Cir. Case No. 18-5186, Doc. #1782986) at 5 (explicitly acknowledging "the seriousness of the deficiencies found by this Court"); *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 501 (D.C. Cir. 2019) ("*Semonite IV*") (noting Corps' concession).  Nor do they explain why this Court should now disregard the agency's concession.  *Id.*  And, perhaps most importantly, neither Defendant disputes that the Corps cannot — and will not even attempt to — substantiate its original decision to issue a FONSI.  *Id.*

Instead, Defendants argue that vacatur would be inappropriate because the Corps may "reaffirm its substantive decision to permit the Project" on remand.  Dominion Reply at 13; *see also* Corps Reply at 5 (same contention).  The argument mis-characterizes the Corps' NEPA violation and mis-understands the law.  The NEPA violation was the agency's issuance of an EA and FONSI instead of a full EIS.  *Semonite III*, 916 F.3d at 1087.  Therefore, in applying the first *Allied-Signal* factor, the relevant question is whether the Corps may be able to substantiate its original decision to proceed with an EA and FONSI rather than an EIS — not, as Defendants would have it, whether the Corps may ultimately re-issue the Permit after remand.  Adopting Defendants' position would mean that no violation of NEPA — a statute establishing strict

---

[2] Although it does not contest that the requirement to prepare an EIS is at the heart of NEPA, Dominion claims this fact is irrelevant to the first *Allied-Signal* factor.  Dominion Reply at 13.  The Court of Appeals has squarely rejected this contention.  *See Oglala Sioux Tribe v. Nuclear Reg. Comm'n*, 896 F.3d 520, 536 (D.C. Cir. 2018) ("The seriousness of the NEPA deficiency is particularly clear here because the point of NEPA is to require an adequate EIS before a project goes forward…").

procedural requirements, not agency permitting authority — could ever satisfy the first *Allied-Signal* factor. Such an outcome cannot be reconciled with decades of case law confirming "the primacy of vacatur to remedy NEPA violations." *Public Emp. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.,* 189 F. Supp. 3d 1, 2 (D.D.C. 2016) ("*PEER*") (collecting cases).[3] Not surprisingly, the Court of Appeals has squarely rejected it. *See Oglala Sioux* 896 F.3d at 536 ("NEPA is a purely procedural statute, and taking such an approach [to *Allied-Signal*] would vitiate it").

Indeed, the case law is quite clear. At least four published NEPA decisions in this Circuit specifically confirm that the first *Allied-Signal* factor turns on whether, on remand, the Corps can substantiate *its original decision to issue a FONSI. See WildEarth Guardians v. Zinke,* 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (*Allied-Signal* analysis evaluating whether "the agency will necessarily fail to justify its decision to issue EAs and FONSIs."); *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 98 (D.D.C. 2017) (under first *Allied-Signal* factor, court was required to "assess the likelihood that, on remand, the Corps will be able to justify its prior decision to issue an EA and FONSI…"); *Humane Soc'y v. Johanns*, 520 F. Supp. 2d 8, 37 (D.D.C. 2007) (ordering vacatur "with the understanding that the [agency] can reissue another permit if and when the NEPA record of decision so allows"); *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) (ordering vacatur despite the lead agency's ability to "reissue another permit"). Defendants have not distinguished any of these cases. Corps Reply at 5-6; Dominion Reply at 12-14. Nor have they identified a single NEPA case supporting their contrary view that the first *Allied-Signal* factor turns on whether the Corps may re-issue the Permit (as distinguished from the FONSI).

---

[3] Nor would this fundamental problem be confined to NEPA. Adopting Defendants' position would impermissibly "vitiate" (*Oglala Sioux*, 896 F.3d at 536) other procedural statutes — including, but certainly not limited to, the NHPA — in the same manner.

*Backcountry Against Dumps v. Perry*, No. 12-CV-3062, 2017 U.S. Dist. Lexis 139090

(S.D. Cal. Aug. 29, 2017), an unpublished out-of-circuit decision referenced by Dominion, does

not support Defendants' position either.  *Backcountry* did not hold that the Corps' statutory

authority to re-issue a permit (as distinguished from the likelihood that the agency can re-issue a

FONSI) satisfies the first *Allied-Signal* factor.  *Id*. at *6-10.  Instead, it turned on two unique

facts not present here:  (1) an appellate decision specifically excusing the "deficiency" in the lead

agency's purpose and need statement (*id*. at *7-8); and (2) the existence of a Mexican

Environmental Impact Assessment excusing the lead agency's initial failure to consider

environmental consequences outside the United States (*id*. at *8-9).  On these facts, *Backcountry*

found remand without vacatur to be the most appropriate remedy.  *Id*. at *10 ("the Court finds

vacatur unwarranted on these facts").  Contrary to Dominion's assertion (Dominion Reply at 13),

*Backcountry* is not "strikingly similar" to the circumstances presented in this case.

In truth, the most "striking" thing about Defendants' reply briefs is their failure to

seriously dispute or distinguish NEPA cases confirming that the first *Allied-Signal* factor turns

on whether the Corps can substantiate its previous FONSI.  *Compare* NTHP Opp. at 16 *with*

Corps Reply at 5-6 *and* Dominion Reply at 13 n.12.  That failure is fatal here.  The Corps has

admitted that it will not substantiate its FONSI, but instead prepare an EIS.  *See* Corps Motion at

11.  And because the FONSI will not be substantiated, Defendants cannot meet their burden to

establish that the Corps' NEPA violations were not "serious deficiencies."

### 2. The Corps' Erroneous Interpretation Of NHPA Section 110(f) Was A Serious Deficiency

The Court of Appeals also struck down the Corps' erroneous determination that the

Project is not subject to Section 110(f) of the NHPA, holding that the agency must reconsider its

NHPA analysis accordingly.  *Semonite III*, 916 F.3d at 1088-89.  As we previously noted,

Defendants' Motions for Remand Without Vacatur failed to present any argument addressing this violation.  NTHP Opp. at 17.  We also explained that in this Circuit erroneous statutory interpretations are considered "serious deficiencies" for purposes of the first *Allied-Signal* factor — particularly where, as here, the interpretive error involves failure to apply a relevant legal standard.  *Id.* (collecting cases).

Once again, Defendants offer no meaningful reply.  In fact, the Corps' discussion of the first *Allied-Signal* factor says nothing whatsoever about Section 110(f).  Corps Reply at 5-6.  And Dominion's "argument" is just a scant paragraph repeating the company's erroneous assertion that vacatur would be inappropriate because the Corps may re-issue the Permit.  Dominion Reply at 14.  As explained above, that is not the relevant legal inquiry.  The proper question is whether the Corps can substantiate its prior determination that Section 110(f) does not apply.  And the answer to that question is perfectly clear:  the Corps cannot.  *Semonite III*, 916 F.3d at 1089 (requiring Corps to apply Section 110(f) on remand); Corps Motion at 10-12 (agency compliance plans).

Therefore, Defendants have also failed to carry their burden to demonstrate that the Corps' violation of NHPA Section 110(f) was not a "serious deficiency."

**B.**     ***Allied-Signal* Factor Two:  "Disruptive Consequences" Do Not Justify Remand Without Vacatur**

The second *Allied-Signal* factor addresses "the disruptive consequences" of vacatur.  *Allied-Signal*, 988 F.2d at 150-51.  Although Defendants have alleged a laundry list of potential "disruptions," none of their claims withstand scrutiny.

1.      **Defendants' Claims of Disruption to Electric Reliability Do Not Justify Remand Without Vacatur**

a)      **Vacatur Would Not Remove The Project From Service**

Defendants' centerpiece argument is that vacatur would destabilize the electric grid, leading to rolling blackouts. Corps Reply at 16; Dominion Reply at 16-18. But that contention is fatally undermined by their own assertions that vacatur would not actually require the Project to be removed from service. Corps Motion at 14-15. Indeed, both Defendants have taken the position that vacatur merely opens the door to the *possibility* of administrative proceedings in which Project removal would be *one of several potential remedies* the Corps could evaluate. Corps Motion at 14-15; Dominion Motion at 31. Assuming, for the sake of argument, that the Corps has accurately described its own administrative process (*see* Corps Motion at 14-15), Defendants' concerns about electric reliability cannot possibly justify remand without vacatur. After all, if vacatur does not require the Project to be removed from service, it does not disrupt electric reliability either.

Dominion argues remand without vacatur is justified by the mere potential for future regulatory proceedings that could result in Project removal. Dominion Reply at 15-16. But that is not the law. In this Circuit, imprecise or speculative claims of disruption are not enough to justify a departure from the presumptive APA remedy of vacatur. *See, e.g., PEER,* 189 F. Supp. 3d at 3 (rejecting speculative claims); *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 22 (D.D.C. 2014) (abstract concerns about future regulatory uncertainty insufficient to warrant remand without vacatur); *Bldg. Indus. Legal Def. Found. v. Norton*, 231 F. Supp. 2d 100, 106-07

(D.D.C. 2002) (abstract arguments insufficient to justify remand without vacatur).[4]  It is not yet known whether vacatur will lead the Corps to initiate any future administrative proceedings.  Nor is there any way to know what the outcome of any such proceedings might be.  Moreover, Dominion has strenuously argued that these questions cannot be adjudicated here.  *See* Dominion Reply at 22.  Therefore, the threat of future proceedings remains too imprecise and speculative to justify remand without vacatur.

Dominion also implies that state and federal regulators oppose vacatur, arguing that "each of the independent regulatory bodies responsible for ensuring the reliability of the electric grid — PJM, SCC, and DOE — has concluded that the [Project] is necessary to meet reliability criteria in the NHRLA."[5]  Dominion Reply at 16.  There is no merit to this suggestion.  DOE has never participated in this case, and there is no evidence that it has taken any position on the appropriateness of vacatur.  And while PJM and the SCC have applied to file *amicus curiae* briefs in support of Defendants' motions for remand without vacatur, the arguments set forth in those briefs inaccurately assume that vacatur automatically requires the Project to be removed from service.  PJM Amicus (ECF 106-3) at 3; SCC Amicus (ECF 109-1) at 4-5.[6]  Neither PJM nor the SCC has identified <u>any</u> reliability risk from actual conditions, in which the Permit is vacated but the Project remains in service.

---

[4] Perhaps recognizing that the case law in this Circuit does not support its position, Dominion relies solely on Ninth Circuit authority.  Dominion Reply at 16 (citing *Cal. Cmtys Against Toxics v. Envtl. Protection Agency*, 688 F.3d 989 (9th Cir. 2012)).

[5] PJM refers to PJM Interconnection, LLC.  Dominion's mention of the "SCC" and "DOE" refer to the Virginia State Corporations Commission and the United States Department of Energy, respectively.

[6] The last two pages of the SCC's proposed *amicus curiae* brief are not numbered.  Here, we refer to the paragraph beginning "In weighing the harm…" and ending "…construction of the line."

**b)**       **Defendants Have Vastly Overstated The Threat Of Disruption To Electric Reliability**

As we previously explained, Defendants' motions for remand without vacatur overstated the threat of disruption to electric reliability in two fundamental ways. *See* NTHP Opp. at 19-22. First, Defendants mis-characterized existing measures to preserve reliability in the North Hampton Roads Load Area ("NHRLA"),[7] including PJM's Remedial Action Scheme ("RAS"). *Id*. at 19-20. Neither the Corps nor Dominion offers any specific counter-argument on this point. Corps Reply at 7-9 (no reference to NTHP argument regarding RAS); Dominion Reply at 16-18 (same).[8]

Second, Defendants' motions for remand without vacatur failed to account for the steep decline in electricity demand within the NHRLA since the Project was first proposed in 2012. NTHP Opp. at 21. Defendants do not dispute the sharp decline in demand for electricity within the NHRLA. Corps Reply at 7-9; Dominion Reply at 17. Tellingly, neither does PJM.[9] Nevertheless, Dominion argues that "PJM has confirmed the existence of grid reliability risks" in "current conditions." Dominion Reply at 17 (fourth bullet). In support of that statement, the company refers to paragraph 12 of the Declaration of Steven Herling, submitted by PJM in connection with its proposed *amicus curiae* brief. *Id*. But the analysis in Mr. Herling's

---

[7] As this Court is aware, the NHRLA is the region of Virginia intended to be served by the Project.

[8] Rather than presenting any new facts or argument, the Corps simply repeats an inaccurate statement previously rebutted in our Opposition Brief. *Compare* Corps Reply at 8 *with* Corps Motion at 16 *and* NTHP Opp. at 20.

[9] Although PJM has requested leave to file a "reply" brief addressing expert testimony in related case number 1361, the organization has not made a similar request to address expert testimony in this case regarding declining demand. *Compare* Declaration of Richard Tabors (ECF 110-1) (expert testimony regarding declining demand) *with* PJM Reply Amicus (ECF 109-1) (PJM "reply").

Declaration (like the remainder of PJM's proposed *amicus curiae* submission) erroneously assumes that vacatur would automatically require the Project to be taken out of service. Declaration of Steven Herling (ECF 106-4) ("Herling Dec.") at 5, ¶ 12.[10] Because that assumption is inaccurate (*see* Corps Motion at 14-15), so too is Dominion's suggestion that PJM has "confirmed" vacatur would cause "grid reliability risks" in "current conditions" (Dominion Reply at 17).

**c)      Any Disruption To Electric Reliability Would Be Attributable To Dominion's Own Inequitable Behavior**

Moreover, to the extent any risk to electric reliability actually exists, it would be entirely attributable to Dominion's inequitable choice to decommission the Yorktown 1 and Yorktown 2 power plants. These power plants, operating pursuant to a DOE order, served as a backstop assuring grid reliability in the Project's absence. On March 9, 2019, ***with full knowledge that the Project was unlawful and the Permit had been vacated by the Court of Appeals***, Dominion and PJM decommissioned Yorktown 1 and 2, thereby removing the backstop. Herling Dec., ¶ 11. And removal of the backstop, in turn, created the alleged reliability risks on which Dominion's motion for remand without vacatur now relies. *See, e.g.,* Dominion Motion at 32; *see also* Corps Motion at 23 (same argument); PJM Amicus at 5 ("upon retirement of Yorktown 1 and 2, the [Project] is necessary to ensure the reliability of electric service").

The equitable doctrine of unclean hands is rarely applied in APA cases, but this is a textbook case. Dominion chose to decommission Yorktown 1 and 2 despite (or perhaps because of) its knowledge that (1) the Yorktown units were serving as the electric reliability backstop for the Project; and (2) the Project had been declared unlawful and its Permit vacated. It now relies

---

[10] Dominion identifies the Herling Declaration as ECF 126-4, using the docket number from related case number 1361. The identical declaration can be found at ECF 106-4 in this case.

on the absence of Yorktown 1 and 2 as a scare tactic, arguing that remand without vacatur is necessary because there is no longer any backstop for the Project. Since remand without vacatur is an equitable remedy (*Fertilizer Inst. v. U.S. Envtl. Protection Agency*, 935 F.2d 1303, 1313 (D.C. Cir. 1991)), Dominion's deeply inequitable conduct precludes the company's requested relief.

In reply, Dominion argues that it acted "prudently and responsibly" by "proceed[ing] with construction of [the Project] as soon as it was legally authorized to do so." Dominion Reply at 19. Even if that were an accurate account of *the Project's construction*, it would not explain or excuse *the company's decommissioning decision*. And, with respect to the decommissioning decision, the suggestion that Dominion acted "prudently and responsibly" — or with any regard for "legal authorization" — is simply too rich to swallow. It bears repeating that Dominion and PJM finalized the decision to decommission Yorktown 1 and 2 on March 9, 2019. At that time, the Court of Appeals had already declared the Project unlawful and ordered the Permit vacated. In other words, there was no "legal authorization" for the Project, and Yorktown 1 and 2 stood as the electric reliability backstop. Decommissioning the Yorktown units in that circumstance — *i.e.*, removing the backstop for a transmission line which had been declared unlawful — was neither "prudent" nor "responsible." It was gamesmanship, pure and simple. No prudent and responsible actor would play "chicken" with the federal courts.

Dominion also contends that its decommissioning decision did not cause any electric reliability risks because Yorktown 1 and 2 were expected to shut down years ago. Dominion Reply at 19-20. To hear the company tell it, the Yorktown units reached the end of their useful lives in 2015, were not intended to operate beyond that time, and degraded quickly after they

14

ceased regular operations in April, 2017. *Id*. But this argument raises more questions than it answers. For example:

- If the Yorktown units reached the end of their useful lives in 2015 and were never expected to operate beyond that time, why, in 2017, did Dominion represent that the Project could be removed from the James River after construction? (*see, e.g.,* Dominion Opposition to Preliminary Injunction (ECF 29) at 38-39).

- If the Yorktown units degraded quickly after April, 2017, why, in 2018, did Dominion insist that removal of the Project was a "real world" response to any adverse merits decision? (*see* Order Denying Motion for Injunction Pending Appeal (Case No. 17-1361, ECF 117) at 4-5).

- What (if anything) did the company have in mind as a replacement for the backstop provided by Yorktown 1 and 2 in the event that the Project was in fact removed from the James River?

Dominion's reply brief provides no answers.

Finally, Dominion complains that "by the time the [Project] was placed into operation in March of 2019, these Yorktown units no longer could be operated reliably without major repairs." Dominion Reply at 20. But the company fails to disclose that on February 8, 2019 — *just one month before the decommissioning decision* — PJM, with notice to Dominion, petitioned DOE to allow Yorktown 1 and 2 to continue serving as the electric reliability backstop for the NHRLA. Declaration of Matthew Adams ("Adams Dec."), ¶ 2. If the Yorktown units "could no longer be operated" at that time, why did PJM file the petition? And if PJM filed the petition in error, why did Dominion not seek an immediate correction? Again, Dominion's brief provides no answers. Dominion Reply at 19-22.

Nor has Dominion shown that it lacked the resources needed to make whatever repairs to Yorktown 1 and 2 may have been necessary. On the contrary, the evidence suggests that the maintenance issues about which Dominion now complains (*see* Dominion Reply at 19-20) were

long-recognized and well within the company's capabilities to correct.  For example, one of

Dominion's declarants states that issues with the common stack at Yorktown 1 and 2 — the most

substantial of the (allegedly) necessary repairs — have been "evident" since 2007, and are

expected to require "in the range of $9 to $12 million."  *See* Second Declaration of Rick Boyd

(ECF 111-4), ¶ 4.  This is not an insignificant sum, but it pales in comparison to the $277 million

in excess profits Dominion received in 2019 alone.  Adams Dec., ¶ 3.  In short, Dominion had

the notice, the technical capability, and the economic resources necessary to maintain Yorktown

1 and 2.  Therefore, the company's (alleged) need to repair those facilities does not weigh in

favor of remand without vacatur.  *See New York City v. Pine*, 185 U.S. 93, 107 (1902) ("he who

seeks equity must do equity"); *see also PEER*, 189 F. Supp. 3d at 5 (availability of alternative

means of managing disruption counsels in favor of vacatur); *Otay Mesa Property L.P. v. U.S.*

*Dep't of the Interior*, 344 F. Supp. 3d 355, 379 (D.D.C. 2018) (same).

> ## 2.     The Corps' Claims of Administrative Inconvenience Do Not Justify
>          Remand Without Vacatur

Federal Defendants argue that vacatur would inappropriately "frustrate the Corps' efforts

to timely issue the EIS ordered by the D.C. Circuit" by requiring the agency to conduct

additional administrative processes under the Clean Water Act ("CWA") and Rivers and Harbors

Act ("RHA").  *See* Corps Motion at 13.  We previously identified three fundamental flaws in this

argument.  First, applicable statutes and regulations affirmatively require the Corps to comply

with NEPA while simultaneously carrying out its duties under other regulatory frameworks.

NTHP Opp. at 24.  Second, case law confirms that additional administrative proceedings are not

the kind of "disruption" that can justify remand without vacatur.  *Id*. at 25 (citing *PEER*, 189 F.

Supp. 3d at 4).  Third, published records demonstrate that during the last two years the Corps has

prepared dozens of EISs while also conducting numerous CWA and RHA proceedings.  NTHP

Opp. at 26 & n.6 (compiling Federal Register notices and agency budget requests).  The Corps

has not specifically replied to any of these points.  Corps Reply at 7.  Nor has it submitted any

factual evidence to substantiate its claims.  *Id.*  The agency's claims of administrative

inconvenience should therefore be treated as abandoned.[11]

### 3.     Defendants' Remaining Claims of Disruption Do Not Justify Remand Without Vacatur

Defendants' remaining claims of disruption require little in the way of response.

Dominion briefly argues that vacatur would be inappropriate because Plaintiffs may be

able to secure relief through the EIS process.  Dominion Reply at 12.  The argument relies on

*Public Emp. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077 (D.C. Cir. 2016), which is

thoroughly distinguished in our Opposition Brief.  *See* NTHP Opp. at 27-28.

Dominion previously expressed concern about several types of "uncertainty."  Dominion

Motion at 31-33.  In response, we explained that, as a matter of law, mere "uncertainty" does not

justify remand without vacatur.  NTHP Opp. at 26-27.  We also noted that some of Dominion's

"uncertainties" seemed to weigh *in favor of* vacatur.  *Id.* at 27 n.7.  The company's reply brief

says nothing about this issue.

Dominion complains about the potential cost, time, and environmental consequences of

removing the Project from the James River.  Dominion Reply at 18 n.17; *see also* Corps Reply at

8.  As we previously explained, these complaints are without basis because (1) Dominion has

admitted that vacatur would not require removal; and (2) the company voluntarily assumed the

---

[11] Should this Court wish to entertain additional argument, however, we note that the Corps has now retained an outside consultant to prepare the EIS.  Adams Dec., ¶ 4.  As a general matter (and assuming no conflicts of interest) there is nothing illegal about using an outside consultant for this purpose.  *See* 40 C.F.R. § 1506.5.  But the Corps' decision to do so here further undermines the agency's contention that vacatur would somehow interfere with completion of the EIS.

risk of economic harm by choosing to proceed with the Project while litigation was pending.

NTHP Opp. at 26; *see also Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092-93 (9th Cir.

2014) (equitable balance did not favor project proponent who elected to proceed despite

knowledge of legal risk); *Sierra Club v. Army Corps of Eng'rs*, 645 F.3d 978, 996-98 (8th Cir.

2011) (same).[12]

### C.   Vacatur Will Protect The Purpose And Integrity Of The EIS Process

The Court of Appeals explicitly directed this Court to "determine the remedies necessary to

protect the purposes and integrity of the EIS process."  *Semonite IV*, 925 F.3d at 502.  We

previously identified the purposes of the EIS process requiring protection:  (1) although phrased in

procedural terms, the purpose of an EIS is "to affect [an] agency's substantive decision" (*Robertson*

*v. Methow Valley Citizens' Ass'n*, 490 U.S. 332, 350 (1989)); (2) an EIS is intended to contribute to

forward-looking decision-making, not to "rationalize or justify decisions already made" (40 C.F.R.

§ 1502.5); (3) protection of historic and cultural resources is a central purpose of the EIS process

(*see* 42 U.S.C. § 4331(b)); and (4) rigorous exploration and objective evaluation of alternatives is

"the heart" of an EIS (40 C.F.R. § 1502.14).  NTHP Opp. at 29-30.  We also noted that recent

factual developments suggest the availability of feasible alternatives not previously considered by

the Corps.  *Id.* at 30.  And we identified specific reasons why the Corps may not be committed to a

rigorous, objective evaluation of those alternatives.  *Id*. at 30-31.

In reply, the Corps argues that the purposes and integrity of the EIS process are "not part of

the *Allied-Signal* test" and should therefore be disregarded.  Corps Reply at 9.  The agency's

position is utterly and completely without merit.  For one thing, the courts regularly consider the

---

[12] To avoid ambiguity or further distortion of our position (*see* Dominion at 15-16), we note that
*Drakes Bay* and *Sierra Club* balanced the equities in the context of requests for injunctive relief
rather than requests for remand without vacatur.  These cases are cited for the general
proposition that the equitable balancing process discounts self-inflicted economic harm by
parties who elected to proceed with their projects despite notice of legal risk.

statutory purposes of NEPA when applying the *Allied-Signal* factors.  *See, e.g., Oglala Sioux*, 896 F.3d at 536; *PEER*, 189 F. Supp. 3d at 3; *Humane Soc'y*, 520 F. Supp. 2d at 38.  For another, consideration of "the purpose and integrity of the EIS process" was specifically ordered by the Court of Appeals.  *See Semonite IV*, 925 F.3d at 502.  To borrow a phrase from that court, it is "more than a little troubling" that the Corps believes the integrity of the EIS process should be disregarded.  *Id.*

For similar reasons, this Court should also reject the Corps' plea for a "presumption of regularity."  Corps Reply at 9-10.  The fact that the agency is unwilling or unable to follow the Court of Appeals' clear directions is more than enough to rebut any such presumption.  And, if more evidence were needed, it could easily be found in the Corps' own reply brief.  For example, the agency seeks to draw a distinction between EISs evaluating proposed future actions and EISs prepared after an action has already begun.  *See* Corps Reply at 9-10.  In suggesting that the two are different, the agency has effectively confirmed that it does not intend to objectively evaluate the Project from a clean slate.  A second example involves the Corps' inaccurate description of the deficiencies identified by the Court of Appeals.  The agency has suggested that the appellate panel found just two "specific" problems.  Corps Reply at 5.  In actuality, the Court of Appeals invalidated the Corps' entire EA and FONSI after identifying numerous factual, analytical, and legal errors — and the appellate panel stopped there only because it saw "no reason to address most of the remaining questions" in light of the Corps' obligation to begin anew on remand.  *Semonite III*, 916 F.3d at 1088.  On the whole, the Corps briefing paints a clear and unfortunate picture of an

agency that cannot manage to come to grips with — much less correct — its previous errors.  The agency simply is not prepared to start from a clean slate unless this Court vacates the Permit.[13]

Because the Corps has clearly stated that it draws a distinction between EISs prepared for prospective projects and EISs prepared for projects already under way (*see* Corps Reply at 9-10) and Dominion has demonstrated a willingness to take actions that limit available remedies and preclude potential alternatives to the Project (*see* part II.B.1.c, *supra*), Plaintiffs respectfully request that this Court vacate the Permit pursuant to the Court of Appeals' direction to "protect the purpose and integrity of the EIS process" (*Semonite IV*, 925 F.3d at 502).

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that Defendants' motions for remand without vacatur be denied.

Respectfully submitted this 15th day of September, 2019.

*/s/ Matthew G. Adams*

Matthew G. Adams (*pro hac vice*)
Jessica L. Duggan (*pro hac vice*)
Samuel Kohn, D.C. Bar No. 1023158
Dentons US LLP
One Market Plaza, Spear Tower, 24th Floor
San Francisco, CA  94105
(415) 882-0351
matthew.adams@dentons.com
jessica.duggan@dentons.com
samuel.kohn@dentons.com

Elizabeth S. Merritt, D.C. Bar No. 337261
Sharee Williamson, D.C. Bar No. 990497
National Trust for Historic Preservation

---

[13] Dominion's "presumption of regularity" argument (Dominion Reply at 9-10) is functionally identical and fails for the same reason.  After all, it is the Corps that must serve as the lead agency for the EIS process.

2600 Virginia Ave. NW, Suite 1100
Washington, DC 20037
202-297-4133
emerritt@savingplaces.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of September, 2019, I caused service of the foregoing Sur-Reply In Opposition To Defendants' Motions For Remand Without Vacatur to be made by filing it with the Clerk of the Court via the CM/ECF System, which sends a Notice of Electronic Filing to all parties with an e-mail address of record who have appeared and consented to electronic service. To the best of my knowledge, all parties to this action receive such notices.

       */s/ Matthew G. Adams*

       Matthew G. Adams (*pro hac vice*)
       Dentons US LLP
       One Market Plaza
       Spear Tower, 24th Floor
       San Francisco, CA  94105
       (415) 882-0351
       matthew.adams@dentons.com