**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, ) ) ) Plaintiff, ) ) v. ) ) TODD T. SEMONITE *et al.*, ) ) Defendants ) ) and ) ) VIRGINIA ELECTRIC & POWER COMPANY, ) ) Defendant-Intervenor. ) | Civil Action No. 1:17-cv-01361-RCL |
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES and ASSOCIATION FOR THE PRESERVATION OF VIRGINIA ANTIQUITIES, ) ) ) ) ) Plaintiffs, ) ) v. ) ) TODD T. SEMONITE *et al.*, ) ) Defendants, ) ) and ) ) VIRGINIA ELECTRIC & POWER COMPANY, ) ) Defendant-Intervenor. ) | Civil Action No. 1:17-cv-01574-RCL |

**MEMORANDUM OPINION**

On March 1, 2019, the D.C. Circuit determined that the U.S. Army Corps of Engineers ("Corps") violated the National Environmental Policy Act ("NEPA") by failing to complete an

1

Environmental Impact Study ("EIS") before issuing a permit to the Virginia Electric and Power Company ("Dominion") to construct the Surry-Skiffes Creek-Whealton project ("the project"). The D.C. Circuit, however, was unaware that the project was completed shortly before they issued their opinion.[1] Upon learning of the project's completion shortly thereafter, the D.C. Circuit remanded the case to this Court to determine the appropriate remedy.

Before turning to the ultimate question of whether vacatur is proper, two threshold questions must be addressed: (1) whether defendants waived or forfeited the right to contest that vacatur is the appropriate remedy; and (2) whether defendants are judicially estopped from contesting that vacatur is the appropriate remedy. For the reasons set forth below, this Court finds that waiver, forfeiture, and judicial estoppel are all inapplicable here. Furthermore, the Court finds that vacatur of the permit is not appropriate in this case. The Court will therefore remand to the Corps without vacatur but with instructions to complete an EIS in accordance with the D.C. Circuit's ruling.[2]

## WAIVER & FORFEITURE

Waiver of a right is distinct from forfeiture of a right. Waiver is the "intentional relinquishment or abandonment of a known right or privilege." *United States v. Olano*, 507 U.S. 725, 733 (1993). In contrast, forfeiture is the "failure to make the timely assertion of a right." *Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017). Nothing in the record supports the notion that defendants ever "intentional[ly] relinquish[ed] or abandon[ed] . . . a known right or

---

[1] The only work that remains to be completed on the project is the installation of protective fiberglass jackets around the pipe piles at each foundation for the towers located in the James River. There are 206 piles that remain to be jacketed out of a total 416. Allen Decl. at ¶ 6, NPCA ECF No. 127-3.
[2] According to representations that the Corps made to the Court at the hearing on October 15, 2019, the EIS process is already well underway. The Court encourages the Corps to continue working on the EIS at such a commendable pace.

privilege," and therefore only the forfeiture issue will be addressed further. *Olano*, 507 U.S. at 733.

Plaintiffs are correct that defendants' appellate brief contained only one reference to their desired remedy—remand without vacatur—in the event that they lost on the merits. Plaintiffs also stress the fact that this one reference was in the brief's conclusion, and they cite *Bryant v. Gates* in arguing that an issue is waived or forfeited when a party's argument on an issue consists of only a single, conclusory statement. 532 F.3d 888, 898 (D.C. Cir. 2008) (holding in part that an as-applied First Amendment Free Speech challenge was "doubly forfeit" when not raised in the district court and when included in the appellate brief only as a "single, conclusory statement"). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

Although plaintiffs cite numerous cases to support their forfeiture arguments, those cases all involved the forfeiture of a *merits* issue rather than forfeiture of a *remedy* issue.[3] The question of whether the Corps needed to conduct an EIS (the merits issue) is separate from the question of whether vacatur is appropriate in this situation (the remedy issue). In *Honeywell Intern., Inc. v. EPA*, the concurring opinion explained that the merits of a case and the appropriate remedy are

---

[3] In *Catawba City, N.C. v. EPA*, the Court found two arguments regarding statutory interpretation to have been waived. 571 F.3d 20, 38 (D.C. Cir. 2009). In *United States v. Whitmore*, the Court noted that a party's argument about an Advisory Committee Note for the Federal Rules of Evidence was improperly raised for the first time on appeal. 384 F.3d 836, 836-37 (D.C. Cir. 2004). In *Bryant v. Gates*, the Court found an as-applied Free Speech challenge to be waived because it was not raised in either the district court or the appellate court. 532 F.3d 888, 898 (D.C. Cir. 2008). In *Hospital of Barstow, Inc. v. NLRB*, the Court refused to consider certain merits arguments raised by the petitioner regarding the authority of the National Labor Relations Board. 897 F.3d 280, 290-91 (D.C. Cir. 2018). In *Carducci v. Regan*, the Court declined to consider an unanalyzed constitutional claim that "literally consisted of no more than the assertion of violation of due process rights." 714 F.2d 171, 177 (D.C. Cir. 1983). Every single one of these cases related to waiver or forfeiture of an argument on a merits issue rather than an argument about the proper remedy, making this case easily distinguishable from the authorities that plaintiffs cite.

different issues that should be treated separately. *See* 374 F.3d 1363, 1375 (D.C. Cir. 2004) (Randolph, J., concurring). Questions of remedy are commonly reserved for post-decision motions, and "[i]t is quite rare for the parties even to mention the question of remedy in their merits briefs." *Id.* at 1375. Although plaintiffs argue that the *Honeywell* concurrence turns in their favor because Judge Randolph also wrote that "vacating (or reversing) and remanding unlawful agency action, rather than simply remanding, should always be the preferred course," that phrase is relevant to the ultimate issue of whether vacatur is proper here, not to whether defendants forfeited their right to contest vacatur. *Id.* at 1374-75. Because the question of whether an EIS was required is separate from the question of whether vacatur is warranted, defendants did not forfeit their right to contest that vacatur is the appropriate remedy when they omitted those arguments from their appellate brief. Essentially, it is standard practice on appeal to wait until after a decision on the merits to raise arguments regarding the proper remedy, which is precisely what defendants did here.

Even if defendants had forfeited their right to contest vacatur, this Court would still have the authority to consider the appropriateness of vacatur if "injustice might otherwise result." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *see Hormel v. Helvering*, 312 U.S. 552, 557 (1941). Due to the project's importance as a power source in the region and the amount of money at stake, it would be unjust not to reach the ultimate question of whether vacatur is the appropriate remedy in this case. Regardless of what defendants did or did not argue on appeal, the hundreds of thousands of people whose power source could be impacted by this decision are not responsible for what defendants included in their appellate briefs, yet they are the ones who would be directly affected if the Court failed to reach the remedy issue in this case. Therefore,

even if defendants had waived or forfeited their remedy argument, the Court would still exercise its discretion to reach the question of whether vacatur is appropriate in this instance.

## JUDICIAL ESTOPPEL

Judicial estoppel is an equitable doctrine that precludes a party from "adopting a legal position in conflict with one earlier taken in the same or related litigation" in order to "protect the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). When determining whether judicial estoppel applies, courts generally consider three factors: (1) whether a party's later position is clearly inconsistent with their earlier position; (2) whether judicial acceptance of an inconsistent position in a later proceeding would create the perception that the court was misled; and (3) whether the party asserting the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 750-51.

Beginning with the first factor, defendants have not taken "clearly inconsistent" positions throughout this litigation. At the preliminary injunction stage, defendants argued that there would be no irreparable harm without a preliminary injunction because the court could later order the towers torn down if plaintiffs prevailed on the merits. Plaintiffs have since prevailed on the merits, and defendants are now within their rights to argue against vacatur as the appropriate remedy. Defendants said that the court *could* order vacatur if plaintiffs prevailed on the merits, not that the court *must* order vacatur if plaintiffs prevailed on the merits. For example, defendants stated at the preliminary injunction stage, "[I]f necessary . . . any visible infrastructure could be removed and the existing views thus fully restored." Dominion's Mem. in

5

Opp. to Plaintiff's Motion for Preliminary Inj. at 38, National Trust ECF No. 22.[4] They also acknowledged that "[t]he D.C. Circuit has made clear that courts have the authority to order removal of completed infrastructure projects upon finding violations of the National Environmental Policy Act . . . if equity so requires." Dominion's Mem. in Opp. to Plaintiff's Emergency Motion for an Inj. Pending Appeal at 3, NPCA ECF No. 114. Similarly, defendants noted that if plaintiffs prevailed on the merits, Dominion would likely "have no choice but to remove the towers . . . absent express authority from a court or otherwise" because it "would be within the Court's authority to order Dominion to take down the towers." *Id.* at 10. Even when there is ambiguity about whether a clear inconsistency exists, courts should "assum[e] there is no disabling inconsistency, so that the second matter may be resolved on the merits." *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010) (quoting 18B Charles Alan Wright, Arthur Miller & Edward H. Cooper, Federal Practice and Procedure § 4477, at 594 (2d ed. 2002)). It is thus presumed that judicial estoppel does not apply unless the opposing party can show that it should, which plaintiffs have not been able to do.

Even the briefs that defendants submitted to this Court after the D.C. Circuit remanded the case are not clearly inconsistent with their previous contention that the court could order vacatur. Although defendants argue that vacatur is unwarranted here, at no point do they claim that this Court *must not* order vacatur or that this Court is *without the power* to order vacatur— they merely try to persuade the Court to exercise its vast discretion in their favor. The difference between *could* and *must* is paramount, as that distinction is what prevents this Court from finding a "clear inconsistency" under the first factor of the test. *New Hampshire*, 532 U.S. at 750-51.

---

[4] Because this action is comprised of two consolidated cases with different case numbers, each ECF citation is preceded by either "NPCA" (for Case No. 17-cv-1361) or "National Trust" (for Case No. 17-cv-1574).

6

Turning to the second factor, plaintiffs overstate what constitutes the perception that the court was misled. Plaintiffs contend that the mere perception, absent evidence of malintent, is sufficient to warrant the application of judicial estoppel. That is simply not true. The Supreme Court specifically stated that judicial estoppel should not be applied "when a party's prior position was based on inadvertence or mistake." *Id.* at 753. Likewise, the D.C. Circuit has explained that estoppel is about preventing "cold manipulation" rather than "unthinking or confused blunder." *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C. Cir. 1980).

More importantly, however, the second factor is not met because this Court was not actually misled, and "[i]t follows that judicial estoppel should not be applied if no judicial body has been led astray." *Id.* This Court certainly never took defendants' argument that the court *could* later order vacatur to mean that this Court would be *required* to order vacatur. It has always been understood that although vacatur is the standard remedy, there would still be discretion not to order vacatur. The Court certainly never expected Dominion to stop building the towers when plaintiffs' preliminary injunction was denied, as that would have essentially amounted to a self-imposed injunction. The Court recognized the possibility of the towers being completed while this litigation was still pending, yet both this Court and the D.C. Circuit denied the preliminary injunction. This Court also understood that if plaintiffs prevailed on the merits, the project's status would be considered under the second *Allied-Signal* factor when deciding whether to order vacatur. Although the D.C. Circuit expressed concerns about defendants' arguments, it is unlikely that they were misled either, as the D.C. Circuit undoubtedly understood when ruling on the preliminary injunction that the *ability* to order vacatur is not the same as being *required* to order vacatur. In short, those who recognize the difference between "could"

7

and "must" will understand that the court was not misled, and thus the second factor does not weigh in favor of applying judicial estoppel.

Looking at the third factor, there is no unfair detriment to plaintiffs or unfair advantage for defendants such that judicial estoppel is warranted. Although at first glance it may seem unfair that defendants benefit from completing the project before the D.C. Circuit was able to issue their ruling requiring an EIS, that unfairness was not caused by any inconsistent position taken by defendants. As explained above, defendants did not make any misrepresentations to this court or take clearly inconsistent positions. Any unfairness was caused not by defendants, but by this Court's unwillingness (and the D.C. Circuit's subsequent unwillingness) to issue a preliminary injunction. Defendants cannot be judicially estopped from arguing against vacatur simply because the courts—who understood that if plaintiffs ultimately prevailed on the merits, the status of the project would be taken into account when determining the appropriate remedy—decided against issuing an injunction. Additionally, as previously noted, the Court could not possibly have expected defendants to stop building upon denial of the preliminary injunction, as that would have amounted to a self-imposed injunction. Therefore, because any disadvantage to plaintiffs or advantage to defendants is not the result of a misrepresentation or inconsistent position on defendants' part, the third factor does not point towards applying judicial estoppel.

Finally, it is worth noting that if this Court were to find defendants to be judicially estopped from arguing against vacatur, plaintiffs would also be estopped from making certain arguments in any post-vacatur proceedings. In explaining why they believe defendants cannot demonstrate that vacatur would lead to serious harm, plaintiffs emphasize that the second *Allied-Signal* factor is only concerned with the direct consequences of vacatur rather than with the impact that vacatur will ultimately have. Essentially, plaintiffs argue that because vacating the

8

permit alone does not *automatically* force defendants to tear down the project, any harm that would be caused by tearing down the project is irrelevant, and the Court may not consider it.[5] Plaintiffs repeatedly stress that destruction of the towers is "hypothetical" and could only "theoretically affect electrical service from the transmission line." Sur-Reply of Plaintiff National Parks Conservation Association in Support of its Opposition to Defendants' Motions for Remand without Vacatur at 17, NPCA ECF No. 142. If, however, this Court were to order vacatur, plaintiffs would almost certainly initiate proceedings to have the project torn down. Indeed, plaintiffs continually specify that *at this time* they are seeking only vacatur of the permit rather than removal of the project, strongly implying that if the Court were to order vacatur, plaintiffs would argue for removal of the towers in a future proceeding—despite having represented to the Court that such removal was purely "hypothetical." *Id.* This would be analogous to how defendants previously argued that the Court *could* later order removal of the project even though they never planned to concede that vacatur was the appropriate remedy should they ultimately lose on the merits. Therefore, in light of both the three-factor test and plaintiffs' own arguments, it would be inappropriate to apply judicial estoppel in this case. It is thus appropriate to turn to the question of the appropriate remedy for failing to complete an EIS as required by NEPA.

## **REMEDY**

Although vacatur is the standard remedy in APA cases, it is not warranted here. *See Allied-Signal, Inc. v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C.

---

[5] As discussed later in this Opinion, the Court does not agree with plaintiffs' interpretation of the second *Allied-Signal* factor, but their argument nonetheless serves as a perfect analogy in explaining why judicial estoppel is inapplicable here.

9

Cir. 1993) (explaining that although vacatur is the standard remedy for improper agency action, courts have discretion to choose a different remedy). Because vacatur is the default remedy, plaintiffs are correct that defendants bear the burden to prove that vacatur is unnecessary. *Allied-Signal* sets forth two factors to consider when determining whether vacatur is appropriate. *Id.* First, *Allied-Signal* requires consideration of "the seriousness of the order's deficiencies." *Id.* Second, *Allied-Signal* requires consideration of "the disruptive consequences of vacatur." *Id.* Neither factor is dispositive, as "there is no rule requiring either the proponent or opponent of vacatur to prevail on both factors." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015) (citing *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008)). Instead, "resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives." *Id.* at 270 (remanding without vacatur when the first factor favored vacatur but the second did not); *see AARP v. EEOC*, 267 F. Supp. 3d 14, 38-39 (D.D.C. 2017) (remanding without vacatur when the first factor favored vacatur but the second did not). As discussed below, this Court finds that despite the deficiencies in the Corp's actions, the severe consequences of vacating the permit warrant a deviation from the standard remedy. The Court will therefore order remand without vacatur.

**I. The Deficiency was Serious under the First *Allied-Signal* Factor.**

Looking at the first *Allied-Signal* factor, the Court does not assess the deficiency of the ultimate decision itself—the choice to issue the permit—but rather the deficiency of the determination that an EIS was not warranted. The D.C. Circuit found that the Corps violated NEPA by failing to conduct an EIS before issuing the permit to Dominion. The Appellate Court explained that the Corps should have determined that the project would lead to serious environmental impacts as defined by NEPA, which should have triggered an EIS instead of a

mere Environmental Assessment ("EA"). *See Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (citing 40. C.F.R. § 1508.27). Three factors indicated that there would be serious environmental impacts as a result of the project. First, the "degree to which the effects on the quality of the human environment are likely to be highly controversial" was significant. *Id.* at 1083 (quoting 40 C.F.R. § 1508.27(b)(4)). Second, "the geographic area" had "[u]nique characteristics . . . such as proximity to historic or cultural resources." *Id.* at 1086 (quoting 40 C.F.R. § 1508.27(b)(3)). Third, the "degree to which the action may adversely affect districts [or] sites . . . listed in or eligible for listing in the National Register of Historic Places" was high. *Id.* at 1087 (quoting 40 C.F.R. § 1508.27(b)(8)). In ordering that the Corps must conduct a full EIS, the D.C. Circuit specified that "Congress created the EIS process to provide robust information in situations precisely like this one, where, following an environmental assessment, the scope of a project's impacts remains both uncertain and controversial." *Id.* at 1087-88.

On remand, the Corps cannot substantiate its initial procedural decision to forgo an EIS, as the D.C. Circuit has already found that such a decision would violate NEPA. Additionally, conducting a proper EIS without the lines and towers already in place would potentially lead the Corps to make a different substantive decision. Although the Corps could ultimately substantiate their original substantive decision to issue to the permit, that is not a foregone conclusion, as the EIS will be far more extensive than the EA. All of this is to say that the seriousness of the defect is significant. If the first *Allied-Signal* factor were the only consideration, the standard remedy would likely apply. The second *Allied-Signal* factor, however, is critical to the ultimate determination that vacatur is not appropriate in this instance.

11

## II. Vacatur would Result in Seriously Disruptive and Harmful Consequences under the Second *Allied-Signal* Factor.

Under the second *Allied-Signal* factor, vacatur may not be warranted if it would lead to serious, disruptive consequences. Plaintiffs essentially ask the Court to ignore these disruptive consequences and claim that all the Court may consider is vacatur of the permit itself rather than the consequences that will certainly follow from vacatur. *See* Sur-Reply of Plaintiff National Parks Conservation Association in Support of its Opposition to Defendants' Motions for Remand without Vacatur at 17, NPCA ECF No. 142. This Court, however, will not ignore the simple fact that if vacatur were ordered, that decision would have serious impacts beyond the mere procedural step of saying that the permit is revoked.[6] By revoking the permit, this Court would set in motion a chain of events that could lead to the type of serious, disruptive consequences with which the second *Allied-Signal* factor is concerned.

In their Sur-Reply, Plaintiffs all but announce their intention to initiate proceedings to have the project removed if their request for vacatur is granted. *See id.* (continually stating that Plaintiffs *at this time* are not asking for removal of the towers, thus implying that they will be seeking removal of the towers in the future). Additionally, this Court ordered plaintiffs to answer the following question: "If this Court should decide to vacate the permit, do plaintiffs expect to initiate further proceedings (prior to completion of the Environmental Impact Study) before an agency, administrative law judge, this Court, or any other judicial body requesting removal of the Surry-Skiffes Creek-Whealton Project?" NPCA ECF No. 143; National Trust ECF No. 121. National Trust for Historic Preservation in the United States ("National Trust") and Association

---

[6] Plaintiffs' logic regarding what this Court may and may not consider under the second *Allied-Signal* factor is unsound. It is the consequences of revocation that *Allied-Signal* tasks courts with assessing, not simply the mere procedural step of revocation. To say otherwise would be to nullify the second factor in any case where the deficiency was procedural in nature.

for Preservation of Virginia Antiquities ("Preservation Virginia") answered with a clear "no," stating that they will only initiate further litigation if the EIS process is not properly followed and clarifying that they do plan to participate in that EIS process. National Trust ECF No. 123. If National Parks Conservation Association ("NPCA") had answered in the same way, this Court would be less concerned that the harms associated with vacatur (explained below) would actually come to pass; however, NPCA answered the question very differently than did National Trust and Preservation Virginia. NPCA stated that it has "no concrete plans" to seek project removal, yet that phrase appears to be contingent upon the Corps taking "enforcement action against Dominion for maintaining a structure in the James River without a lawful permit." NPCA ECF No. 144 at 1-2. The Court interprets NPCA's response as saying that if the Corps does not take action against Dominion and have the project removed, NPCA will. The Court is also unable to comprehend why plaintiffs would forgo the opportunity to ask for removal in this forum and instead ask only for vacatur. The only logical explanation is that plaintiffs want to minimize the appearance of harm under *Allied-Signal's* second factor by asking only for vacatur at this stage, thus setting the scene to ask for project removal in some other forum in the future—in which case the permit will already have been vacated and project removal will be that much easier to achieve.

Furthermore, even if plaintiffs did not initiate proceedings to have the towers removed following a vacatur order, defendants would be in violation of the law by continuing to operate the project without the permit. Therefore, inability to operate the towers is not a purely "hypothetical" or "theoretical[]" result of vacatur. Sur-Reply of Plaintiff National Parks Conservation Association in Support of its Opposition to Defendants' Motions for Remand without Vacatur at 17, NPCA ECF No. 142. It is instead the likely effect of vacatur. At the very

moment that the Court would order vacatur, the project would be in direct violation of the law requiring a permit.

Now that the existence of real-world consequences following vacatur have been established, it is necessary to assess the severity of those real-world consequences under the second *Allied-Signal* factor. After thoroughly analyzing the evidence that both plaintiffs and defendants presented, including all submitted declarations, this Court finds that the disruptive consequences of vacatur would be very serious. One major consequence of vacatur would be the threat of rolling blackouts in the region. *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993-94 (9th Cir. 2012) (ordering remand without vacatur because under the second *Allied-Signal* factor, vacatur would "delay a much needed power plant" without which "the region might not have enough power next summer, resulting in blackouts[]"). In 2012, it became clear that a new electricity source would soon be necessary for the North Hampton Roads Area, which is comprised of defense, emergency, health care, industrial, water treatment, educational, and other facilities. Allen Decl. at ¶ 5, NPCA ECF No. 127-3. Without the two coal-fired units at the Yorktown Power Plant which were scheduled for deactivation in 2015, Dominion would have been in violation of mandatory federal grid reliability requirements, and there would have been a high risk of rolling blackouts during peak electricity demand periods. Rowe Decl. at ¶ 4, NPCA ECF No. 133-3. Dominion, PJM Interconnection L.L.C. ("PJM"), and the Virginia State Corporation Commission proposed this project as the solution, and the Corps ultimately agreed to issue the permit after conducting an EA. The project became operational on February 26, 2019, thereby resolving the power emergency in the region. *Id.* at ¶ 5.

Since its installation, the project has become a crucial source of electricity in the area. Before it became operational, numerous measures had to be taken to stabilize the power supply.

The Virginia Department of Environmental Quality ("DEQ") and the U.S. Environmental Protection Agency ("EPA") had to grant Dominion special permission to continue operating the Yorktown units in violation of emissions limits. Letter from DEQ to Dominion at 1, NPCA ECF No. 24-19; EPA, *In the Matter of Virginia Electric and Power Company*, AED-CAA-113(a)-2016-0005, at 8-9, NPCA ECF No. 24-20. After receiving all possible regulatory extensions available under the Mercury Rule, PJM applied to DOE for an emergency order under the Federal Power Act to continue operating the Yorktown units when necessary. Letter from DOE to PJM, NPCA ECF No. 24-21. DOE granted (and had to continually renew) the emergency order until the project was energized, with the last emergency order expiring on March 6, 2019. *See* Lazzaro Decl. at ¶ 6, NPCA ECF No. 22-5; Rowe Decl. at ¶ 4, NPCA ECF No. 133-3. In total, the Yorktown units were used on 89 different days to address power shortages during extreme hot or cold weather. Rowe Decl. at ¶ 4, NPCA ECF No. 133-3.

At this point, the Yorktown units are no longer a viable solution to the electric reliability needs of the North Hampton Roads area. *Id.* at ¶ 7 (explaining that aging units can "no longer be reliably operated for any extended period . . . without major repairs at significant costs and time"). The evidence shows that the Yorktown units have failed and are no longer available to solve the power shortage in the region should the project be removed. *See id.* at ¶ 7. Additionally, the 325-foot tall common stack used to vent emissions from units 1 and 2 required repeated repairs due to its age, and at this point the stack's potential for failure poses a safety risk for workers at the site and could damage the remaining oil-fired Yorktown unit. That is why the stack is currently undergoing the demolition process. Boyd Decl. at ¶ 8. Essentially, the Court finds that because the Yorktown coal units would no longer serve as a reliable backup in the event that the project were shut down, there would be a serious risk of blackouts in the area.

Plaintiffs accuse defendants of overstating the importance of the project as a regional power source. Plaintiffs' support for this accusation, however, is weak. For example, plaintiffs rely heavily on the Declaration of Earl W. Shockley. That declaration, however, makes no mention of the fact that the Yorktown units are no longer operational. *See* Shockley Decl., NPCA ECF No. 130-5. By failing to take this crucial fact into account (and by simultaneously admitting that the Yorktown units are crucial during times of high energy demand), Mr. Shockley fatally undermines his own conclusions. *See id.* at ¶ 7. The Court finds that defendants have not overstated the importance of the project and that serious harm would likely result from its absence.

Plaintiffs also argue that to the extent there would be any harm, such harm is self-inflicted and thus the Court should not consider it when analyzing the second *Allied-Signal* factor. Essentially, plaintiffs accuse defendants of intentionally decommissioning the Yorktown coal units in order to argue more effectively against vacatur. This is highly unlikely. If defendants truly decommissioned the units in the hopes that it would sway this Court to find vacatur unnecessary, they risked leaving the region without a stable power supply; this risk would be significant considering that vacatur is the default and that it is defendants' burden to convince the Court to deviate from the standard remedy. *See Allied-Signal*, 988 F.2d at 150-51. Moreover, Dominion had already planned to decommission these units long before receiving the permit to build the project and well before plaintiffs filed this lawsuit, making it less likely that their actions were manipulative. See Boyd Decl. at ¶ 6.

Of course, it is *possible* that defendants acted nefariously, but more than mere conjecture is required before finding that to be the case. Additionally, even if the harm were self-inflicted, defendants are not the ones who would suffer most from their own actions—the hundreds of

16

thousands of people in the region relying on this project as their power source would be the ones who face the greatest consequences. It would be unjust to force all of those people to bear the brunt of the harm when they are not responsible for its cause. Therefore, the Court's findings regarding the second *Allied-Signal* factor would remain largely unchanged even if the harm had been self-inflicted.

In addition to the risk that hundreds of thousands of people will be left with an unreliable power source if the permit is vacated, there is also a risk of massive waste. *See Public Emples. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016) (explaining that the second *Allied-Signal* factor includes consideration of "social and economic costs"); *Cal. Cmtys. Against Toxics*, 688 F.3d 989 at 994 (ordering remand without vacatur because under the second *Allied-Signal* factor, vacatur would be "economically disastrous[]"). It is possible that after completing the EIS, the Corps will decide to re-issue the permit for the project. Of course, the Corps will not be permitted to merely rubber stamp its previous decision, but even after a proper EIS, the Corps could potentially come to the same conclusion. If that were the case, large sums of money would have been wasted. Tearing down the River Crossing Line would involve dismantling seventeen steel lattice towers and removing 37.8 miles of conductor, 8.4 miles of fiber optic shield wire, 32 solar panels and solar lighting systems, and all associated hardware. Allen Decl. at ¶¶ 7-10, NPCA ECF No. 127-3. It would take at least six months to plan for and mobilize the specialized manpower and equipment that this work requires, and the actual removal of the lines and towers would take over a year, with the cost of removal totaling approximately $46,000,000. *Id.* at ¶¶ 11-12. If the Corps ultimately does decide to reissue the permit after conducting an EIS, it will take one or two years as well as another $40,000,000 to

reinstall the lines and towers. Essentially, the amount of waste that could result from vacatur is extreme.

Defendants have also highlighted other negative impacts of tearing down the project. For example, removing the lines and towers would produce emissions from tugboats and heavy equipment, which would negatively impact water quality and aquatic life in the area. Motion to Remand to U.S. Army Corps of Engineers by Virginia Electric & Power Co. at 36-37, NPCA ECF No. 127. Of course, it is possible that after completing the EIS, the Corps will decide to select an alternative energy source and remove the project anyway, in which case these harms would still result. At least, however, these harms would not occur only for the project to be rebuilt shortly thereafter.

Plaintiffs further argue that even if there would be actual harm as a result of vacatur, it pales in comparison to the harm plaintiffs suffer while the lines and towers remain in place. *Allied-Signal*, however, does not require ignoring the harm that would result from vacatur simply because the harm to plaintiffs would continue to exist if the case were remanded without vacatur. Quite simply, the negative effects of keeping the project in place while the Corps conducts its EIS do not outweigh the aforementioned harms that will occur if vacatur is ordered. For all of these reasons, the second *Allied-Signal* factor forces the Court to conclude that vacating the permit would be inappropriate.

## CONCLUSION

For the aforementioned reasons, the Court concludes that waiver, forfeiture, and judicial estoppel are all inapplicable here. Additionally, the Court finds that the proper remedy in this

case is remand without vacatur. Therefore, the Court will **GRANT** defendants' motion for remand to the U.S. Army Corps of Engineers without vacatur.

The Court will also **ORDER** the U.S. Army Corps of Engineers to complete the Environmental Impact Study that is currently underway in accordance with the D.C. Circuit's prior ruling.

A separate Order accompanies this Memorandum Opinion.

Date: 11/8/19

Royce C. Lamberth
United States District Court Judge